**HIGHWAY PRODUCTS, INC.**

v.

**The UNITED STATES.**

No. 48–73.

United States Court of Claims.

Jan. 28, 1976.

Before SKELTON, NICHOLS and KUNZIG, Judges.

## ON PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT AND TRIAL DE NOVO AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case comes before the court on plaintiff's request, filed May 8, 1975, for review by the court of the recommended decision of Trial Judge Kenneth R. Harkins, filed April 7, 1975, pursuant to Rule 166(c) on plaintiff's motion and defendant's cross-motion for summary judgment, wherein such facts as are necessary to the decision are set forth. The case has been submitted to the court on the briefs and oral argument of counsel. Since the court agrees with the recommended decision of the trial judge, as hereinafter set forth, it hereby affirms and adopts the said decision as the basis for its judgment in this case. Therefore, plaintiff is not entitled to recover, its motions for summary judgment and trial *de novo* are denied, defendant's cross-motion for summary judgment is granted and plaintiff's petition is dismissed.

## OPINION OF TRIAL JUDGE

HARKINS, Trial Judge:

This case stems from a competitively negotiated, firm, fixed-price supply contract with the Department of the Army for 30 Hawk missile launchers[1] and is before the court on cross-motions for summary judgment for review, pursuant to Wunderlich Act[2] standards, of nine claims denied by the Armed Services Board of Contract Appeals (ASBCA).[3]

Plaintiff seeks $123,026.10 for additional costs allegedly incurred because its low bid and the contract price resulted

Timothy V. Dix, Akron, Ohio, for plaintiff. Richard E. Guster, Akron, Ohio, atty. of record. Roetzel & Andress, Akron, Ohio, of counsel.

Russell W. Koskinen, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant.

1. Contract No. DA33–019–ORD–3972.

2. 41 U.S.C. §§ 321, 322 (1970).

3. *Highway Products, Inc.,* ASBCA No. 10050, 68–2 BCA ¶ 7190. Plaintiff's motions are filed under Rules 101 and 163(b)(2), pursuant to order on July 27, 1973, that directed plaintiff, with respect to grounds for relief outside the contract, to file a motion for summary judgment or, in the alternative, to list any contentions of fact that would require a trial de novo for resolution. Except as to evidence on damages, plaintiff relies upon the administrative record and does not want to submit further evidence on liability.

from a defective body of technical information that accompanied the request for proposals (RFP), which defects were not corrected by defendant until after plaintiff's bid was confirmed. Plaintiff asserts five alternative grounds for relief:

(1) Forty of the ASBCA's findings of fact are challenged as not supported by substantial evidence and seven of the ASBCA's conclusions as erroneous as a matter of law;

(2) The supply of source information previously omitted in the RFP technical package was a compensable change in the circumstances of this case;

(3) An express agreement entered concurrently with the execution of the contract would permit plaintiff to be compensated for performance requirements of which it was not aware when it submitted its bid;

(4) Defendant's representatives overreached plaintiff by accepting a contract that they knew was based on defective drawings and specifications as well as misinformation; and

(5) Mistake of material fact rendered the written terms of the contract different from the contract intended by the parties.

For the reasons set forth below, the findings of the ASBCA are supported by substantial evidence, its conclusions are legally correct, and plaintiff's claims for relief outside the contract are not supported by the record.

The Hawk missile system had been developed by the United States Army Missile Command at Redstone Arsenal (Redstone), Alabama. Raytheon had been the prime contractor and a Division of Northrop Corporation had been the sole source subcontractor for Hawk missile launchers. About 700–800 Hawk missile launchers had been manufactured prior to plaintiff's contract, which was the first breakout for competitive procurement of the launcher. Plaintiff's management was experienced in Government procurement and familiar with Government contract principles. Plaintiff's president and chief executive officer, over a 21-year period, had held engineering or management positions with firms that had Government contracts in excess of $300,000,000.

On January 26, 1962, the Ordnance District of Cleveland (Cleveland Ordnance) solicited proposals for the launchers from 10 potential manufacturers, including plaintiff, Highway Products, Inc. The RFP consisted of the standard transmittal letter, which stated in part "[p]roposals should include a statement to the effect that you understand the requirements and can comply therewith," a schedule, a list of standard clauses, and an Exhibit A, which listed applicable drawings, applicable specifications, missile purchase descriptions (MPD's), and military and federal standards. The technical package called out in the RFP included approximately 2,400 drawings and totaled approximately 3,000 individual items.

Exhibit A to the RFP had been compiled at Redstone. Reproducible drawings, the MPD's, and design agency specifications were assembled at Redstone and furnished to the various procurement districts for reproduction. The various districts added the Army and Navy specifications (AN's), the joint Army and Navy specifications (JAN's), and other similar specifications, and put together the technical packages to accompany the RFP's. Since a specific purpose of the procurement breakout was to obtain additional supply sources for the launcher and its component parts, source information was deleted from the drawings in the RFP technical package.

Plaintiff's claims arise from deficiencies and discrepancies in the technical packages furnished by defendant from the documents that comprised the RFP and the executed contract. Exhibit A, in both the RFP documents and in the executed contract, was the same and referenced the same lists of drawings, specifications, MPD's and other standards. The technical package that was delivered with the RFP differed from the package that was delivered in association with the executed contract. The RFP package did not contain all of the drawings and specifications listed on Exhibit A,

nor did it contain all referenced but unlisted drawings and specifications, and many of the drawings that were furnished were illegible. After plaintiff had submitted its bid and by the time the contract was executed, or shortly thereafter, however, plaintiff had been furnished a complete technical package.

The record is not clear, and, in the circumstances, the board could make no finding that would specify the items that plaintiff received in the RFP technical package. Testimony of plaintiff's witnesses and defendant's witnesses as to the completeness of the RFP technical package is in conflict. Further, plaintiff's assertions as to the completeness of the RFP technical package differed during the course of the bidding and negotiating process. In addition, the record is not clear whether the technical package that was delivered in connection with execution of the contract consisted of the complete package that originally was supposed to be with the RFP, or whether it contained drawings that showed the changes that had taken place since the technical package had been frozen for the procurement, and which were the basis for negotiation of changes that ultimately were incorporated in contract Modification Nos. 1 and 8.

Plaintiff received the RFP technical package in early February 1962. Although plaintiff's examinations showed the technical package to be deficient, the board found that plaintiff, before it submitted its bid, "never made or attempted a complete and exhaustive analysis and identification of all of the various drawings and specifications making up the RFP package."[4] This finding is supported by substantial evidence.

On February 15, 1962, after preliminary telephone discussions with the contract administrator at Cleveland Ordnance about drawing problems, plaintiff submitted a list of 53 missing drawings, 18 unlisted but referenced drawings, and requested replacement of one illegible drawing. On February 20, 1962, during a visit to Redstone, plaintiff's contract administrator obtained all but nine of these 71 missing or unlisted drawings, and the nine remaining drawings were delivered subsequently by special delivery.

On February 22, 1962, plaintiff used the drawing problem as a basis for its request for a 2-week extension for submission of a proposal. Plaintiff's letter did not request other drawings and indicated that only a time extension was needed:

> Some of these missing drawings turned out to be of such a nature that we could have scarcely submitted a reasonably accurate proposal without them, and most of the assembly drawings which were not included were the only means of determining quantities of components involved.

> Inasmuch as we found it necessary to suspend some of our bidding analysis pending receipt of these missing drawings, and because of the complexity of determining component sources, we feel that an extension of the closing date is in order.

Plaintiff's request was granted. Plaintiff's proposal was submitted on March 20, 1962, without further mention of any drawing problem. Plaintiff's letter of transmittal recited "[w]e wish to state that we understand the requirements of this proposal and are capable of complying therewith."

On April 2, 1962, plaintiff amended its proposal to correct an arithmetical error in the analysis of special tooling costs. Plaintiff's letter discussed the drawing problem and indicated it had been solved.[5] As amended, plaintiff proposed a unit price of $28,647, with the total value of the contract at $863,910.

On April 9, 1962, during a preaward survey at plaintiff's plant, the Redstone

---

**4.** 68–2 BCA at 33,363.

**5.** The letter reads, in part, as follows:

"Although the condition of these drawings was unfortunate and delayed our estimating progress, we are of the opinion that their in-

clusion at this point would not change our bid estimate.

"In case we should be awarded this contract, we would, however, want to request at least one complete and legible set of drawings for engineering and production purposes."

representative warned plaintiff's administrator that two complex and difficult components of the launcher—the contact assembly and the axial piston pump—had not been properly priced and that the amounts plaintiff had allowed for procurement or manufacture were considerably less than the amounts required in previous procurements. Plaintiff's contract administrator was told the previous sources and the prices allowed for both the axial piston pump and the contact assembly. Notwithstanding this warning and information, plaintiff's management, on April 17, 1962, confirmed its bid, which was more than $4,000 less than the next higher bidder (who was found to be a nonresponsible bidder) and approximately $20,000 per unit less than the price quoted by the former sole source contractor.

Cleveland Ordnance, on April 24, 1962, notified plaintiff that it would probably receive the award and, on May 10, 1962, delivered the contract to plaintiff for signature. In the interim, plaintiff had tried to make up a bill of material, which effort was unsuccessful because of drawing deficiencies. On May 16, 1962, plaintiff notified Cleveland Ordnance that its examination of the Exhibit A, which was to be incorporated in the contract, showed it "had the same built-in deficiencies as the old" and that further examination showed there were "120 missing referenced drawings and 63 deficient, unreadable drawings." Plaintiff requested the following steps be taken before execution of the contract:

1. A new and complete set of drawings and drawing list, which will not require constant application for missing drawings, which result in interruptions of effort.

2. A revision to a more realistic delivery date in order to accomplish the above.

3. Agreement on the cost of contemplated changes to be incorporated in the original contract price.

Representatives of Cleveland Ordnance, Redstone, and plaintiff met at Redstone on May 22–23, 1962, to resolve the drawing problem. Plaintiff's representatives at Redstone had no authority to execute the contract. During this meeting, the conditions in plaintiff's May 16, 1962, letter were discussed and representatives of the Government "indicated that they had no intention of seeing that [plaintiff] was hurt and that they would see that they were compensated for any changes that were made in the drawings, and that these changes would be subject to negotiations." [6]

Plaintiff brought to the Redstone meeting a list of approximately 83 missing or defective drawings. A breakdown of the reproducing machine prevented delivery at the meeting of nine or 10 drawings, which were delivered subsequently on June 5, 1962. It was agreed at Redstone that negotiation of drawing changes that had taken place after the technical package had been frozen for the procurement would not be made before the contract was executed.

On May 25, 1962, plaintiff transmitted the signed contract to Cleveland Ordnance with a letter of transmittal which stated:

We are attaching herewith signed contract, covering Launcher, Zero Length, Guided Missile, sent to us with your letter of May 9, 1962, for execution.

We are signing this contract with the following understanding:

1. Our proposal, dated 20 March 1962, was based upon the drawings and specifications made available to us in your Invitation No. RFQ M–1–86–2, dated 26 January 1962.

2. That Cleveland Ordnance District and AOMC recognize that the information on which our proposal was based is incomplete.

The legal office at Cleveland Ordnance advised the contracting officer that plaintiff's transmittal letter presented a serious question as to whether agreement had been reached by the parties, which question should be resolved before the Government executed the contract.

On May 29, 1962, plaintiff's general sales manager was told by the Cleveland Ordnance contract administrator that the exceptions were unacceptable to the contracting officer. The Government representative recommended that the second sentence of the transmittal letter be deleted and suggested the following substitution therefor: " 'That any additions, deletions or changes to the drawings set forth in the original RFP will be subject to negotiation between Highway Products and the Government.['] "

A new transmittal letter dated May 29, 1962, with some alteration of the language suggested, was authorized by plaintiff's general sales manager by telegram. The new letter substituted the following as the last paragraph: "That any additions, deletions or changes will be subject to negotiations between our company and the Government."

On June 8, 1962, Cleveland Ordnance submitted an 11-page list of changes in the contract drawings and specifications as revised April 1, 1962, and requested plaintiff's price proposal therefor. Plaintiff, on August 16, 1962, proposed a total time extension of 120 days, a unit price increase of $2,909.51 to a total of $31,556.51, and a total contract price increase to $946,695.30.[7]

Plaintiff's August 16, 1962, transmittal letter noted that "the list of drawings submitted with the bid request and later with the contract itself, contained many discrepancies, errors, and omissions," as a justification for its requested time extension. In this letter, plaintiff did not submit any price proposal for defects in the RFP technical package, nor did it give notice that claims for additional changes would be submitted subsequently. Plaintiff's letter indicated that there was only one other minor "area of possible price adjustment pending, in the form of inspection equipment, which we now find was not included in either the bid or contract lists."

Plaintiff's claims for defects in the RFP technical package that are involved in this case were not included in its August 16, 1962, proposal and were not presented to the contracting officer until January 10, 1964.

I.

Plaintiff contends that the May 22–23, 1962, meeting at Redstone and discussions about revision of the May 25, 1962, transmittal letter resulted in an express agreement to compensate plaintiff for performance costs of which it was not aware when it submitted its bid because of defects in the original RFP technical package. This contention has some support in the contract documents.

Plaintiff's contract in this case consists of the formal contract documents on DD Form 1261 and, in addition, the revised transmittal letter, dated May 29, 1962, that stated in paragraph 2 "That any additions, deletions or changes will be subject to negotiations between our company and the Government." Paragraph 1 of the revised transmittal letter identified the RFP technical package as the basis for plaintiff's March 20, 1962, bid and the content of paragraph 2 in that context is not clear. Where a provision of a contract is unclear, and is capable of being interpreted in two reasonable ways, it is ambiguous.[8]

Where there is an ambiguity in the contract instrument, it is appropriate to go outside the formal documents and ascertain the intent of the parties by examination of the details of the May 22–23, 1962, Redstone meeting and other materials in the contracting process. The Redstone meeting was called for the purpose of trying to resolve plaintiff's drawing problem so that the contract either could be executed expeditiously or a new procurement initiated. Plaintiff's

---

**7.** Modification No. 8, June 6, 1963, amended the contract to reflect price increases resulting from the June 8, 1962, changes. The unit price was increased to $31,456.51 and the total contract price was increased to $943,695.30. In a subsequent contract for 29 additional Hawk missile launchers, plaintiff was paid a unit price of $36,500.

**8.** *Sun Shipbuilding & Dry Dock Co. v. United States*, 393 F.2d 807, 815, 183 Ct.Cl. 358, 372 (1968); *Bennett v. United States*, 371 F.2d 859, 861, 178 Ct.Cl. 61, 64 (1967).

representatives at the Redstone meeting had no authority to enter a binding contract and were only authorized to obtain information and to make recommendations to plaintiff's management. No final agreement could have been made at Redstone. There is conflicting testimony in the record as to the content of the Redstone discussions. The board found that the discussions at the May 22–23, 1962, meeting at Redstone involved "nothing more than a full explanation of the 'Changes' clause of the proposed contract." [9]

█ The board heard testimony from representatives of each party and made its finding on the basis of the total record. The content of the discussions at the Redstone meeting is a question of fact determined by consideration of conflicting testimony where the trier of fact had the opportunity to observe the demeanor of witnesses. The board's evaluation of credibility is to be accepted unless the testimony is inherently improbable or discredited by undisputed evidence or physical fact.[10]

In addition to the conflicts of testimony as to whether defendant intended a concurrent separate agreement to compensate plaintiff for deficiencies in the RFP technical package, other circumstances militate against acceptance of plaintiff's meaning of the May 29, 1962, transmittal letter. Plaintiff's original May 25, 1962, transmittal letter spelled out the agreement plaintiff says was intended. It would have established a basis for negotiation to compensate for deficiencies in the RFP technical package under an enlarged and modified Changes article. Defendant's contracting officer specifically refused to accept the contract as so modified. Defendant clearly did not contract on May 29, 1962, on the basis that plaintiff now asserts.

Further, if plaintiff believed it had a separate contract to negotiate changes to correct for deficiencies in the RFP technical package, it would have asserted these claims before January 10, 1964.

The logical time to have asserted these claims would have been in the negotiations that followed defendant's June 8, 1962, request for a proposal on changes. Plaintiff, however, was silent on these claims in its August 16, 1962, response to defendant's 11-page list of changes and said nothing to reserve a right to submit these additional changes at a later date.

At the preaward survey on April 9, 1962, plaintiff was given notice that it had seriously underbid two high-priced components of the missile launcher—the axial piston pump and the contact assembly. Notwithstanding this warning, and with knowledge that manufacture of these two items was complex, plaintiff elected to stand on its bid. Nothing in the record would support a finding that defendant's representatives subsequently agreed to compensate plaintiff for errors it had made in its estimate for these two items. Plaintiff's April 17, 1962, confirmation letter, moreover, implied that mishandling of information in the technical package which resulted in "some miscalculation of the value of purchased parts" had been corrected.

█ Substantial evidence in the record supports the board's conclusion that no separate agreement was made to enlarge or modify the Changes article to compensate plaintiff for any drawing deficiencies or changes that were not encompassed in the June 8, 1962, 11-page list of changes. The portions of the transcript cited by plaintiff to support its contention have been reviewed. They do not warrant overturning the board's conclusion on this question of law.

## II.

█ Three of plaintiff's claims (Nos. 1, 2, and 6) are based on the addition of source information to drawings after execution of the contract. Source information had been "blanked out" on drawings in the RFP technical package for the specific purpose of developing new procurement sources. Prior to award of the

---

**9.** 68–2 BCA at 33,365.

**10.** *Koppers Co. v. United States*, 405 F.2d 554, 558 n.7, 186 Ct.Cl. 142, 147 n.7 (1968), and cases there cited.

contract, plaintiff's requests for source information were denied because the information could not be given to one bidder without giving it to all potential bidders. The drawings in the technical package with the executed contract contained source information and Modification No. 7 on October 19, 1962, specifically noted that source notes on the drawings were not a restriction or limitation on procurement sources.

An "approved" source is not the same as a "required" source or a "controlled" source, and addition of source notes was not a change in the contractual relationship of the parties. Plaintiff has not established that prior to Modification No. 7 it was industry practice in the Cleveland procurement district for Government contractors to be limited in procurements to approved sources. The board found that plaintiff's chief executive officer, prior to the submission of its bid, knew that it was not required to purchase any components from the approved sources that later were added to the drawings.

Subsequent addition of source information did not change plaintiff's obligations under the contract. Further, it is not readily apparent how plaintiff would be able to show that the addition of source notes either would increase costs or increase the time required to perform the contract.

Plaintiff has not established that it was misled by the omission of source information in the preparation of its bid nor that the omission of source information created an ambiguity that added to its bid preparation difficulties. At most, the addition of source information after execution of the contract accelerated plaintiff's realization that it may have based its bid on procurements from sources that were more expensive than they otherwise might have been.

### III.

Plaintiff also claims defects in the RFP technical package that involve omitted missile purchase descriptions, missing or illegible "find lists" on drawings, and omitted drawings are eligible for equitable adjustments under the Changes article. Unlike the addition of source information to drawings, plaintiff's remaining claims (Nos. 3, 4, 7, 8, 9, and 11, and parts of Nos. 1 and 6) involve constructive changes that are concerned with missing information and not with changed items.

In its consideration of this category of plaintiff's claims, the board allowed an equitable adjustment on two claims. In one (No. 5), plaintiff was allowed an adjustment where a missing MPD in fact was included neither on Exhibit A nor referred to in other documents in circumstances where, even if plaintiff had been diligent, there still should have been a gap that it could not reasonably be expected to detect. In the other (No. 10), the adjustment was allowed because certain drawings were either illegible or missing, defendant was aware that plaintiff lacked basic information and, from an examination of plaintiff's DD Form 633, defendant's representatives should have recognized another high-cost item had been seriously underbid. As in the case of the contact assembly and the axial piston pump, the board found that this situation was another in which defendant should have notified plaintiff that it had made a substantial underestimation of costs. In sum, the board has allowed equitable adjustments for plaintiff's claims in every instance where the board found that plaintiff reasonably could not have been expected to have done more to discharge its obligations with respect to missing information.

As to its remaining claims, plaintiff is eligible for an equitable adjustment only if it can show that its conduct in preparing its bid was reasonable. When a contractor is faced with an obvious omission, an inconsistency, or discrepancy of significance, he is obligated to bring the situation to the Government's attention if he intends subsequently to resolve the issue in his own favor.[11] In this case, although plaintiff knew, or was in a position where it

---

11. *Space Corp. v. United States,* 470 F.2d 536, 538, 200 Ct.Cl. 1, 5 (1972).

should have been found out, that there were serious deficiencies in the RFP technical package, it did not resolve these matters before it submitted its bid. Reasonable conduct requires greater effort to clarify obvious and important deficiencies than that exerted by plaintiff.

The question of a contractor's duty to inquire or to take further action to remove deficiencies in bidding documents has been before the court in many cases. There is a duty to seek clarification of any obvious omission.[12] Defects in plaintiff's bid package did not involve the type of ambiguous contractual provisions that reasonably are subject to differing interpretations. The state of the RFP technical package does not involve the type of ambiguous contract provisions that would warrant application of the doctrine of contra proferentem.[13] Nor is this a case where the contractor was required to exercise clairvoyance and spot hidden ambiguities.[14] The deficiencies in the RFP technical package could have been uncovered by a mere checking of Exhibit A with the contents of the package. Plaintiff knew, or was in a position to know, what it had or did not have before it signed the contract.

Every drawing or specification relevant to plaintiff's remaining claims, except No. 9, was either included on Exhibit A or referred to in the documents that were included on Exhibit A. To the extent that any of the drawings plaintiff received were illegible, this deficiency could have been remedied by timely inquiry which, in fact, was done with respect to many drawings. In any event, as to these claims for a constructive change, it was at all times within plaintiff's power, prior to execution of the contract, to have acquired the detailed

knowledge requisite to an informed price.

█ This is not a case where plaintiff had no notice of deficiencies before a contract was let. At the time plaintiff signed the contract, it was aware that its bid had been based upon incomplete information.[15] A contractor cannot complain when it knows of added costs and allows its bid to stand.[16]

Plaintiff contends that the board did not apply the proper standard to weigh the degree to which informational gaps in the RFP package were obvious. Plaintiff acknowledges that it knew certain drawings were missing and that certain lists were unreadable but it concluded that any such deficiencies were not important to the preparation of a reasonably accurate bid. Plaintiff refers to expert testimony as to industry practice to work out reasonable bids from the materials received and cites the rule that contractors have a right to rely upon the sufficiency of the bid package. As the court noted in *Blount*,[17] contractors, as businessmen consciously seeking to underbid competitors, are usually pressed for time in the preparation of bids on Government contracts. As a result, they frequently only estimate costs which they feel the contract terms will permit the Government to insist upon in the way of performance. In this case, however, plaintiff did not establish what in fact was the condition of the RFP technical package. The board heard conflicting testimony and found that plaintiff never, in the prebid stage, attempted a complete and exhaustive analysis and identification of the contents of the RFP package. While failure to trace out each and every item in the package may be excusable, certainly plaintiff is required to resolve and seek clarification of miss-

12. *Blount Bros. Constr. Co. v. United States,* 346 F.2d 962, 972, 171 Ct.Cl. 478, 496 (1965).

13. *Tecon Corp. v. United States,* 411 F.2d 1262, 188 Ct.Cl. 15 (1969); *WPC Enterprises, Inc. v. United States,* 323 F.2d 874, 163 Ct.Cl. 1 (1963); *Peter Kiewit Sons' Co. v. United States,* 109 Ct.Cl. 390 (1947).

14. *Blount Bros. Constr. Co. v. United States, supra* note 12, 346 F.2d at 973, 171 Ct.Cl. at 497.

15. *Whittaker Corp. v. United States,* 443 F.2d 1373, 195 Ct.Cl. 161 (1971); *LaCrosse Garment Mfg. Co. v. United States,* 432 F.2d 1377, 193 Ct.Cl. 168 (1970).

16. *Dittmore-Freimuth Corp. v. United States,* 390 F.2d 664, 182 Ct.Cl. 507 (1968).

17. *Blount Bros. Constr. Co. v. United States, supra* note 12, 346 F.2d at 972, 171 Ct.Cl. at 496.

ing materials that were needed to submit reasonable bids on major items. In these circumstances, plaintiff's failure to eliminate the defects was unreasonable.[18]

Exhibit A listed the MPD's that were supposed to be in the technical package. Plaintiff claims that the MPD's were not included and disputes the board's conclusion that they were included in the package that plaintiff received. There is no doubt that the MPD's were listed on Exhibit A, and, at the very least, were incorporated by reference in the RFP technical package. There can be no dispute that the MPD's were a part of the technical package plaintiff was to use in preparing a bid. The board found plaintiff had made no written request for specific MPD's prior to execution of the contract. In view of its engineers' repeated internal requests for MPD's, plaintiff's failure to vigorously pursue missing items of such importance is unreasonable. Plaintiff's contract administrator, at most, made only oral requests to Cleveland Ordnance, and these in very general terms, for missing MPD's, and made no followup to these oral requests.

One of plaintiff's remaining claims (No. 9, the contact assembly) is based on a missing schematic drawing which was neither included on Exhibit A nor referenced on any drawing. At the preaward survey, on April 9, 1962, however, plaintiff's attention was specifically drawn to its inadequate bid on this component, the previous source was disclosed, and the complexities of the assembly were emphasized. Although plaintiff had a week to reconsider, plaintiff made no request for further clarification before it confirmed its bid. Plaintiff, however, had the basic drawing, J9089117, Contact Assembly, Electrical, and had used it in discussions with the Redstone representative on April 9, 1962. Plaintiff's expert recognized the complexity of the assembly as shown by the basic drawing, and should have known that such a complex item necessarily would require a schematic drawing. Plaintiff's failure to correct its bid on the contact assembly cannot be due to the omission of the schematic drawing. Plaintiff was aware of the prior source as well as the price previously paid for this complex component, and nonetheless failed to make further inquiry. Reconfirmation of its bid, in these circumstances, was an unreasonable assumption of risk.

Two of the claims (Nos. 1 and 6) involve missing MPD's. Claim No. 1 concerned the axial piston pump, and the design control drawing in the RFP technical package referenced the MPD. As to this claim also, plaintiff was warned on April 9 that its price was abnormally low. The prior supplier was identified, as well as the price previously paid. Plaintiff nonetheless reconfirmed its bid. Absence of the MPD, which plaintiff could have obtained, if in fact it was not included in the RFP technical package, could not have been the cause of plaintiff's low bid in these circumstances. In claim No. 6, MPD No. 7005A was referenced on Exhibit A and also on the related drawings. Plaintiff did not attempt to locate the MPD so that it could be used in solicitations from potential suppliers. Plaintiff recognized that this component would have to be purchased, but chose to estimate the probable cost of this complex item. Plaintiff's guess turned out to be too low; its assumption of this risk was unnecessary and unjustified. In solicitations for items, potential suppliers are expected to be provided the detailed information on specifications that is made available in a complex missile program.

■ The remaining five claims (Nos. 3, 4, 7, 8, and 11) all involve "find lists" (references to other drawings) that were either missing because the method of reproduction required the large "J" drawings to be done in two sections or were illegible on the drawing reproduction. There can be no excuse for not taking whatever action is necessary to obtain readable reproductions. With respect to each of these claims, plaintiff was in a position to clarify the situation and to obtain the correct information prior to submitting its bid. As to these items, plaintiff did not make any inquiry for

---

**18.** *Chris Berg, Inc. v. United States,* 455 F.2d 1037, 1044, 197 Ct.Cl. 503, 514 (1972).

the missing information until the May 22–23 meeting. Failure to pursue and correct such obvious deficiencies was unreasonable.

## IV.

Plaintiff advances two additional grounds for relief, by reformation of the contract, that could not be made to the board. First, plaintiff contends that defendant's representatives knew that plaintiff's bid was in error because it was based on defective drawings and specifications and that execution of the contract, in such circumstances, constitutes an overreaching by defendant for which reformation is available. The second basis for reformation is an asserted mutual mistake of material fact. The circumstances of this case do not warrant reformation of the contract on either of plaintiff's theories.

As a general rule, this court has jurisdiction in a Government contract case to provide the equitable relief of reformation as an incident to rendition of a money judgment.[19] The purpose of this remedy is to correct contractual instruments and make them conform to the clear intent of the parties. Reformation is in order only where there is a clear-cut clerical or arithmetical error or such a misreading of the contractual documents as to constitute an egregious blunder.[20] The court will reform a contract, by rescission or reformation, where there is an overreaching of a contractor by a contracting officer when the latter has knowledge, actual or imputed by the circumstances, that the bid is based on a serious mistake and, nonetheless, accepts the bid with that knowledge.[21] As evidence of defendant's overreaching, plaintiff cites the wide disparity between plaintiff's low bid and that of the next highest responsible bidder. On bid opening it was found that plaintiff had bid $28,647, and that the next responsible bid was for $43,527. The previous sole source supplier, who in 1962 had delivered 244 launchers at a unit price of $37,500, had bid $54,000 on this procurement. Such disparities, plaintiff asserts, are such to require defendant to be aware that plaintiff's inexperience was the cause of its unreasonably low bid.

On the facts of this case, defendant's awareness cannot amount to an overreaching for which reformation is appropriate. Defendant, in fact, did recognize the bid submitted by plaintiff was abnormally low. Because of this, defendant warned plaintiff that an obvious mistake had been made on two of the more complex items. Notwithstanding this warning, plaintiff did not withdraw and change its bid.[22] Plaintiff's reconfirmation of its bid, in the face of defendant's warnings, manifests bad judgment for which reformation is not available. Plaintiff assumed the risk of the consequences of its mistake.[23]

Nothing in the record supports the contention that a mutual mistake of material fact existed at the time the contract was executed. An agreement cannot be revised to reflect the subjective understanding of one party.[24] No representative of the Government has been shown to have the concept of the contract that plaintiff now advances. Each of the Government's representatives testified that the May 29, 1962, revised transmittal letter, the language of which had been suggested by defendant, was only intended to define plaintiff's rights under the Changes article. Whatever plaintiff's intentions may have been with respect to future negotiations on

**19.** *Space Corp. v. United States, supra* note 11, 470 F.2d at 540, 200 Ct.Cl. at 8; *California-Pacific Util. Co. v. United States,* 194 Ct.Cl. 703, 715 (1971).

**20.** *Ruggiero v. United States,* 420 F.2d 709, 190 Ct.Cl. 327 (1970); *Bromion, Inc. v. United States,* 411 F.2d 1020, 188 Ct.Cl. 31 (1969).

**21.** *Ruggiero v. United States, supra* note 20, 420 F.2d at 713, 190 Ct.Cl. at 335.

**22.** The board also has provided an equitable adjustment with respect to one item that the Government should have warned plaintiff about and which it failed to recognize.

**23.** *Loral Corp. v. United States,* 434 F.2d 1328, 193 Ct.Cl. 473 (1970).

**24.** *Jamsar, Inc. v. United States,* 442 F.2d 930, 194 Ct.Cl. 819 (1971).

deficiencies in the RFP technical package, there is nothing to support a finding that defendant's representatives so agreed. Mutual mistake of material fact must be clearly established on the record. Normally, such mistakes are limited to clear-cut clerical or arithmetical errors. The record would not support a finding that Government representatives manifested an intention to compensate plaintiff for errors it had made on bids for the axial piston pump or on the contact assembly, which had been the subject of specific warnings. The mutual mistake cases have no application to plaintiff's claims.

On the basis of the foregoing, plaintiff's motions are denied, defendant's cross-motion is allowed, and the petition is dismissed.