**JOHNSON CONTROLS, INC.**

v.

**The UNITED STATES.**

No. 229–80C.

United States Court of Claims.

Feb. 10, 1982.

Gregory A. Smith, Washington, D. C., attorney of record, for plaintiff; Pettit & Martin and Kenneth E. Voss, Washington, D. C., of counsel.

Frances L. Nunn, with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D. C., for defendant.

Before DAVIS, NICHOLS and KUNZIG, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's and defendant's motions filed November 30, 1981, requesting that the court adopt the recommended decision of Trial Judge Robert J. Yock filed September 30, 1981, pursuant to Rule 54(b)(3)(iii) as the basis for its judgment in this case. Upon consideration thereof, without oral argument, the court affirms and adopts the same as the basis for judgment.

IT IS THEREFORE ORDERED that the plaintiff's motion for summary judgment on the issue of entitlement is granted in part, and the defendant's cross-motion for summary judgment is granted in part.

This case is remanded to the Veterans' Administration Contract Appeals Board pursuant to Rule 149 for a determination of the amount of plaintiff's recovery. Further proceedings before this court will be stayed for a period of six (6) months from the date hereof. Defendant's counsel is designated to advise the court by letter to the trial judge of the status of the remand proceedings pursuant to Rule 149(f). Attention of counsel and the Board is also directed to Rule 150.

## OPINION OF TRIAL JUDGE

.YOCK, Trial Judge: This contract case involves an appeal from an entitlement decision of the Veterans' Administration Contract Appeals Board (hereinafter the Board).[1] In its initial decision (JC I), the Board found that plaintiff was entitled to recover an equitable adjustment since the Government had provided the plaintiff with defective drawings on which to bid. On a motion for reconsideration, the Board reversed on the merits and held for the Government (JC II). The Board also held on reconsideration that it lacked jurisdiction over the matter in the first instance.

On cross-motions for summary judgment, the parties seek review of the Board's decision in accordance with the standards of the Wunderlich Act, 41 U.S.C. § 321–22 (1976). In addition and in the alternative, the plaintiff seeks relief in equity outside the parameters of the Wunderlich Act.

For the reasons outlined below, plaintiff is entitled to partial recovery.

### Background

The pertinent facts found by the Board or otherwise justified by the administrative record are hereinafter set forth.[2]

On May 22, 1975, the Veterans' Administration Medical Center at San Diego, California (VA), issued an Invitation for Bids (IFB) to supply and install an Energy Monitoring and Control System (system) for its hospital. The system was designed to monitor the air temperature, quality, and humidity at particular points in the hospital, and to transmit the data to a central computer, which would control the flow of hot or cold air into the individual rooms. In place of room thermostats, the system utilized what are known as contact or control points to monitor the condition of the air in a particular area.

The IFB requested the submission of a three-part bid, consisting of a base bid and two alternates, Alternates A and B. Johnson Controls received a bid package that contained two sets of drawings. The bid opening was scheduled for June 19, 1975, and accomplished then. A technical review conference was held with Johnson on June 24, 1975. On June 27, 1975, the plaintiff was awarded the base contract (Contract V664P–476) after a Government consultant had found it to be the low bidder and competent to perform. The IFB specified that the Government had 90 days to accept the two alternatives. Prior to the expiration of the 90-day period, defendant requested and received two time extensions for award of the alternates. On October 10, 1975, the VA hospital awarded the alternates to plaintiff. In the interim, a dispute had arisen concerning the number of control points required under the base contract and Alternate A. Plaintiff filed a timely notice of appeal on October 24, 1975 and on March 3, 1976, the contracting officer acknowledged the October 10th letter of award as her final decision.

The IFB sent to all potential bidders included drawings of the proposed system. The first two pages of the drawings, pages M–1 and M·2, listed 247 control point locations at the hospital and specified, by the use of symbols, what equipment was to be required at these locations by the base bid and each of the alternates. The location of the contact points to be installed was shown on the drawings by a triangle with a numeral inside of it (delta symbol). Under the base bid, a contractor would be required to furnish the complete and functional system, placing control points at those .locations identified on the drawings by the delta symbol $\triangle$. Alternate A required the addition to the system of contact points at locations identified on the drawings by the delta symbol $\triangle$. Alternate B required the addition of contact points at locations identified on the drawings by the delta symbol $\triangle$.

The bid package Johnson Controls received contained three sets of specifications and two sets of drawings (all other bidders received only one set of drawings with the

---

1. VACAB No. 1197, 79–1 BCA ¶ 13,763 (JC I), rev'd, 80–1 BCA ¶ 14,212 (JC II).

2. *See Ordnance Research, Inc. v. United States*, 221 Ct.Cl. 641, 646–47, 609 F.2d 462, 465–66 (1979) and cases cited therein.

IFB). Both sets of drawings were identified as No. SD–1287 dated May 16, 1975, and were composed of pages M–1 through M–6. Only pages M–1 and M–2 of the drawings are relevant here.[3] One set of the drawings, (referred to hereinafter as the final drawings) accurately reflected the contract requirements as intended by the VA. The second set of drawings, however, (referred to hereinafter as the preliminary drawings) differed from the final drawings in that a preliminary draft of page M–1 had been inadvertently included in the M–1 through M–6 drawing package, and this "preliminary drawing package" had been inadvertently included in the IFB package. The Government had ordered all the preliminary draft drawings destroyed before the IFB's were sent out.

The M–1 preliminary drawing differed from the M–1 final drawing in that it omitted the delta symbol entirely from some locations and labeled other locations with the wrong delta symbols. Contact point locations 1–120 on the M–1 preliminary drawing had no delta symbol designation, whereas the final M–1 drawing had a △ designation on each of these locations 1 120. Also, on the M–1 preliminary drawing, locations 121–174 had a △ designation, but the final drawing designated these same locations with △ symbol. The remaining locations, all of which were on page M–2, had identical markings on both sets of drawings. The result of this draw-ing error was that the preliminary drawings reflected the base contract requiring 67 control points and an Alternate A requiring 16 control points. This was substantially less than the amounts required by the final drawings, which were 133 points for the base and 70 points for Alternate A.[4]

Aside from this major difference, page M–1 on both sets of drawings were virtually identical (same dates, numbers, and signature) and there was no effective way to tell which of the two M–1's accurately reflected the intended contract requirements. The IFB specifications did not itemize the number of control points to be included in the base bid or the alternates. Instead, the IFB specified the number of control points the contract required by reference to the drawings and the three delta symbols.[5] In fact, the VA intended the contract requirements to be determined by reference to the final set of drawings.

Plaintiff's branch manager in San Diego, California, Mr. Verle A. Williams received the IFB containing the two sets of drawings in mid-May 1975. Without comparing the two sets, he kept the preliminary drawings for his own use and sent the final drawing package to plaintiff's regional engineer, Mr. Edward B. Henkle, in San Francisco, California, on the same day that he had received them. On June 19, 1975, plaintiff submitted its bid on the base contract and the alternates, relying on the preliminary drawings to determine the number of control points required.[6] The points to

---

**3.** Although only pages M–1 and M–2 are relevant here for discussion purposes, it should be noted and highlighted that only a preliminary draft of M–1 was erroneously included in one of plaintiff's bid packages. Final drawing page M–2 was included in both of the drawing sets sent to plaintiff.

**4.** The control points bid by plaintiff for Alternate B are not in issue since all the △ points were located on drawing page M–2 both copies of which were "final drawing documents" in the plaintiff's two bid drawing packages.

**5.** The language in the IFB pertaining to the base bid provided: "BASE BID: To furnish complete and functional an Energy Monitoring Control System incorporating points of control [contact points] identified by the symbol △ on drawing SD–1287, M–1 & M–2."

The language pertaining to additive Alternate A provided: "Add additional items to Energy Monitoring Control System incorporating points of control identified by the symbol △ on drawing SD 1287, M–1 & M–2."

**6.** Prior to preparing the bid, Mr. Williams sent one of plaintiff's employees to the VA hospital to make a field inspection of the project. This employee took the preliminary set of drawings with him and made certain notations on them to indicate the results of his inspection. When Mr. Williams prepared the bid he used the preliminary drawings rather than the final set because the results of the field inspection were written on them. No one in plaintiff's employ was aware that Mr. Henkle's drawings differed from those used by Mr. Williams until after the bid opening.

be included in the base contract and the alternates were identified on both sets of drawings with the delta symbols $\triangle$, $\triangle$, and $\triangle$. The control point requirements for the base contract, Alternate A, and Alternate B, as indicated by the drawings, are as follows:

|  | | Preliminary Drawings | Final Drawings |
|---|---|---|---|
| Base Contract | $\triangle$ | 67 | 133 |
| Alternate A | $\triangle$ | 16 | 70 |
| Alternate B | $\triangle$ | 44 | 44 |
| Total | | 127 | 247 |

The 120-point total increase on the final drawings is attributable to the omission of any delta symbols on the preliminary drawings (M-1) at locations 1–120. Plaintiff's bid, because it had been based on the preliminary drawings, did not include control points at the locations numbered 1-120, and included the locations numbered 121--174 in the base bid rather than in Alternate A, as the final drawings indicated should have been done.

The bid opening took place on June 19, 1975, at the VA hospital. Three organizations submitted the following bids:

|  | Johnson | Honeywell | Compu-Guard |
|---|---|---|---|
| Base | $181,200 | $317,800 | $223,000 |
| Alternate A | 6,960 | 27,500 | 48,500 |
| Alternate B | 22,900 | 33,600 | 47,000 |
| Total | $211,060 | $378,900 | $318,500 |

After the bid opening, a comment questioning plaintiff's ability to perform at profit for the price it bid on Alternate A by one of the competitor's employees prompted Mr. Williams to examine another set of drawings in the office of one of the engineers at the VA hospital. Mr. Williams noticed that these drawings (M-1) differed from the drawings that he had used in preparing the bid. The drawings he saw at the VA hospital, which were duplicates of the final drawings, included the delta symbol $\triangle$ for the first 120 locations. The drawings that he had used in bidding, the preliminary drawings (M-1), had no delta symbols at these stations. Mr. Williams went to his car to examine the drawings he had used to bid and verified that they differed from the ones he had just seen in the VA's engineer's office. He then left the VA hospital without discussing the matter with any of the Government representatives.

The following day, Friday, June 20, 1975, Mr. Williams returned to the hospital to discuss the contract with Mr. Lyle Clark, Chief of Engineering at the VA hospital and the Government official most closely associated with the project. Mr. Williams advised Mr. Clark that his company was the low bidder and he was interested in determining what Government steps would follow leading to the award of the contract. Mr. Clark responded by advising that there would be a technical review conference scheduled with the bidders including the plaintiff, after which there would be further evaluation by the Government and award.

During the course of this casual discussion which focused on future procedure, Mr. Williams indicated that there appeared to be some drawing differences between his set and another set he saw on "Roger's desk," and he wondered how they were to be resolved. He answered his own question by suggesting that it might be appropriate to receive some official documentation from the Government before taking any action. Mr. Clark agreed with this "suggestion," apparently not focusing on the significance of what was said. Mr. Clark indicated that the conversation was general in tone and in no way alerted him to a potential problem of the magnitude of this case. He thought Williams was speaking of relatively minor drawing deficiencies that are normally resolved after contract award through the engineering submittal process. Mr. Williams did not show Mr. Clark the drawing he had used in preparing the plaintiff's bid, nor did they discuss the drawing discrepancy in any detail. There was also no discussion of any potential error in plaintiff's bid.

After the bid opening, Mr. Williams had attempted to contact the regional office in San Francisco to advise them of the drawing problem and have them check the drawings package they had for purposes of comparison. However, he was unable to reach any of the appropriate regional officers until the beginning of the next week (June 23). When he did reach them (Henkle and Cy Reedy, Regional Manager) he confirmed

that the two sets of drawings were different, *i.e.*, the regional office had the final drawing package and he in San Diego had the preliminary drawings on which he had based his bid. Mr. Williams advised his regional people that he would handle the problem and the regional people concurred in that approach. Mr. Williams also requested Mr. Henkle's presence at the technical review conference which was to take place the next day.

On June 24, Mr. Williams and Mr. Henkle met with the hospital's engineering staff (including Mr. Lyle Clark) and the VA's special contract consultant for the project, Boeing Computer Service, for the purpose of evaluating plaintiff's technical competence and willingness to perform the contract. Mr. Williams was specifically advised at that 2 to 3 hour conference that the Government had heard rumors to the effect that plaintiff had plans or reasons for withdrawing its bid. Mr. Williams advised the Government that it had no such plans and would not withdraw its bid. The Government further inquired as to whether the plaintiff's proposal differed in any respect from the specifications and whether the contract could be performed at the plaintiff's bid price. Mr. Williams responded "no" to the former and "yes" to the latter. Since the plaintiff was the low bidder and was found technically qualified to perform, the Government awarded the base contract to it on June 27, 1975.

Shortly after receiving the award, plaintiff sent to the Government six submittal plans called for by the contract for the purpose of advising the Government how it was going to proceed. On August 7, 1975, the VA approved all of the submittals but item 4, which concerned the number of control points required by the base contract. The reason given for rejection of item 4 was that it did not conform with the scope of the work as indicated on the drawings. The Government attached final drawings M–1 and M–2 to this rejection notice. In response to the rejection, Mr. Williams informed Mr. Clark by letter dated August 8, 1975, that the drawings he had used in preparing the bid differed from the drawings received with the rejection. He specif-

ically stated that his drawings lacked any delta symbols for the first 120 locations on page M–1, and he attached a copy of the M–1 he had used to bid to his letter. This was the first time that the Government was on clear and actual notice of the drawing discrepancy.

Meanwhile, the plaintiff's Alternates (A and B) offers were still pending, awaiting Government award or rejection. On August 25, 1975, the contracting officer, Marian A. Grubbs, requested a 45-day extension of the acceptance period for the alternates for the purpose of clarifying "the exact number of control points specified in the base bid prior to award of the alternates." On August 28, 1975, plaintiff granted the extension to "clarify the exact number of control points specified in the base bid prior to award of the alternates." The Government later requested a second extension, which plaintiff granted, for an additional 10 days. The final date for acceptance of the alternates was October 14, 1975. On October 10, 1975, the contracting officer informed plaintiff by letter that she was awarding plaintiff Alternate A and Alternate B at the bid price. On October 15, 1975, the contracting officer again wrote to Mr. Williams to inform him that plaintiff was to provide the total number of contact points required by the final drawings for the base contract as well as for the Alternates A and B. In this letter, the contracting officer also requested documentation from the plaintiff in order that she could "assess" the error that plaintiff was alleging in the drawings received. Mr. Williams considered this letter to be the final decision of the contracting officer and on October 24, 1975, notified Ms. Grubbs of plaintiff's intent to appeal. On March 3, 1976, the contracting officer acknowledged that plaintiff had timely filed its appeal.

An administrative law judge of the VA's Contract Appeals Board heard evidence on plaintiff's appeal on September 27–29, 1977. The Board unanimously found for plaintiff in an opinion dated March 26, 1979 (JC I). The Board found that plaintiff had discovered the existence of the erroneous drawing only after bid opening and that Mr. Williams immediately and adequately informed

the hospital's chief engineer, Mr. Clark, of the situation in the meeting held in Mr. Clark's office the day after bid opening (June 20). Since the Government was on notice of the erroneous drawing and did not inquire to clarify the matters prior to award, the Government was bound by the interpretation placed on the contract specifications and drawings by the plaintiff. The Board held that plaintiff's reliance on the erroneous drawings was thus reasonable and that the contracting officer's order to install all of the control points constituted a constructive change in accordance with the changes clause of the contract, for which plaintiff was entitled to an equitable adjustment. The Board thereupon remanded the case to the contracting officer for the negotiation of an equitable adjustment.

On defendant's motion for reconsideration, the Board reversed its prior decision, with the author of the original decision dissenting. The Board, in its opinion filed December 19, 1979 (JC II), held that the case actually concerned a mistake in bid matter, which was beyond its jurisdiction in the first instance to try. To the extent that it did have jurisdiction, however, the Board on reconsideration reached the merits and reversed certain important findings of fact found in the first decision and concluded as a matter of law that the plaintiff was not entitled to recover on a constructive change theory. From this reconsideration Board decision, the plaintiff has appealed, and both parties have filed cross-motions for summary judgment.

*Discussion*

Before this court, the plaintiff contends that the Board's reconsideration (JC II) decision is not supported by substantial evidence in the record and is incorrect as a matter of law. Specifically, plaintiff asserts that the Board erred as a matter of law in concluding that the claim was beyond its jurisdiction; in concluding as a matter of law on the merits that plaintiff was not entitled to an equitable adjustment based on a constructive change theory; and as a matter of law in concluding that the plaintiff was under a duty to inform the VA of the drawing differences prior to

award. Plaintiff also contends that the Board erred in finding as a fact that plaintiff was fully aware of the Government error prior to award and failed to place the VA on notice of the error. Plaintiff is therefore requesting reversal of the Board's reconsideration decision on entitlement under the review standards of the Wunderlich Act or in the alternative, if there was no jurisdiction in the Board, such other relief in this court as may be deemed just and proper.

Defendant counters in defense that the findings and decision of the Board are correct as a matter of fact and law and are entitled to finality under the standards of the Wunderlich Act. The Government does not respond to the Board's "no jurisdiction" conclusion but rather insists that the Board's merit decision denying plaintiff's claim is entitled to finality.

### A.   Board Jurisdiction

██ Although neither party before this court is contesting Board jurisdiction, we feel it necessary to discuss the point, at least in a cursory sense, since the Board itself at the end of this extraordinary case denied that it had jurisdiction. Without jurisdiction at the Board, of course, the hearings and the findings of fact and law are essentially a nullity or gratuity and would possibly require further *de novo* proceedings in this court. This would be a waste of judicial time and energy in this case, not to mention the waste of the parties' resources. Especially so since this matter was completely illuminated on its merits in a 3-day hearing and given careful factual and legal consideration by the VA Board. For the reasons discussed below, this court concludes, therefore, that there was jurisdiction in the Board.

██ To begin with, virtually any contract case that has its genesis in a defective drawing can be viewed as a mistake in bid case, or it can be viewed (especially after an award has occurred with no appropriate action taken) as a contract ambiguity case, with the resolution called for within the disputes clauses of the contract. The facts are important to determine which type of animal it is, of course, but even more impor-

tant, in our view, is what legal theory the plaintiff attaches to its claim. It is, after all, plaintiff's claim. If it alleges facts and a legal theory that would support jurisdiction, then jurisdiction attaches. In short, plaintiff's alleged facts and legal theory confers the necessary jurisdiction on the Board. It is not the defendant's legal theory that confers or defeats jurisdiction. *See Wickham Contracting Co. v. United States,* 212 Ct.Cl. 318, 325–26, 546 F.2d 395, 399 (1976); *Airmotive Engineering Corp.,* ASBCA No. 15235, 71–2 BCA ¶ 8988; *Pre-Con, Inc.,* IBCA No. 986–3–73, 73–2 BCA ¶ 10,227.

Furthermore, there is far too much water over the dam in this case to be arguing about jurisdiction. There was an award made in this case, and the dispute arose after the award. Plaintiff alleged no mistake in bid. It alleged that it received a defective drawing that under the factual circumstances it had the right to rely on as a reasonable business person. Since the award was made, and it reasonably relied on the drawing provided by the Government, its interpretation of the contract prevailed. When the Government ordered it to go beyond what the drawings/specifications required, it was entitled to an equitable adjustment under a constructive change theory. The plaintiff may not prevail on the merits but at least it is a rational theory on which to base jurisdiction. *See Wickham, supra,* 212 Ct.Cl. at 327, 546 F.2d at 400.

Finally, both parties before this court are arguing rather strenuously (especially the Government) for a Wunderlich Act review of this case which presupposes jurisdiction in the Board. Before the Board, however, the Government argued just as vigorously that the Board did not have jurisdiction to try this case. In fact, the Government filed three motions contesting jurisdiction—before the hearing, after the hearing, and after the Board's initial (JC I) decision.

Under these circumstances, it would not seem unreasonable to conclude that the Government before this court has waived or abandoned its "no Board jurisdiction" contention and, in effect, has conferred jurisdiction on the Board by agreement of the parties, albeit considerably after the fact. *See General Dynamics Corp. v. United States,* 214 Ct.Cl. 607, 617–18, 558 F.2d 985, 990–91 (1977), and cases cited therein.

For any or all of the above reasons, this court concludes that there was jurisdiction in the Board to decide this case and thus this matter should be reviewed pursuant to the standards of the Wunderlich Act.[7]

### B. Base Contract

■ Although the Board ruled that it lacked jurisdiction, it nevertheless reached the merits of the case and denied plaintiff's claim for an equitable adjustment based on a constructive change theory. Since this court has concluded above that the Board had jurisdiction over this matter, it is incumbent upon the court to consider whether or not, on the facts as found by the Board, its denial of the equitable adjustment was supported by substantial evidence and was correct as a matter of law. The Board (JC II) found that the plaintiff was not entitled to recovery under either the base contract or the alternate awards. Since this court agrees with the Board as to the base contract but disagrees with its conclusions as to the award of the alternates, it will discuss them separately.

Both parties basically agree that this is a contract ambiguity case that turns on which party had the duty to inquire of the other into that ambiguity or discrepancy. Plaintiff insists that the Government had adequate notice sufficient to place the burden on it to clear up any deficiencies. The defendant, on the other hand, insists that it was unaware of the discrepancy until some time after award and that prior to award it was never placed on sufficient notice to have shifted the burden of inquiry to it.

7. In any event, the parties' pleadings clearly signal that they want a "record" review of the matter, either Wunderlich Act review, or review under the court's general contract jurisdiction authority. Plaintiff has not specifically requested a "*de novo*" hearing (required under Rule 162(a)) and the parties have proceeded by filing motions for summary judgment. Record review based on the court's general contract jurisdiction could be accomplished with ease since few if any material facts are disputed.

The facts as found by the Board square with the Government's position as to the base contract. The plaintiff's branch manager, Mr. Williams, was placed on alert by a comment made by a competitor at the bid opening session held on June 19, 1975, that there may be a problem with its bid. Mr. Williams immediately checked another copy of the drawings at the VA hospital that same day and discovered that those drawings differed from the drawings he had bid on. He then left the hospital building and confirmed his observation on his bid drawings that were in his automobile. He then left the VA facility without saying anything to any Government official.

Mr. Williams returned the next day to the hospital and went to Mr. Lyle Clark's office at the hospital to discuss the contract. He inquired of Mr. Clark what the procedural steps would be leading to the award of the contract, since the plaintiff was the low bidder. During the course of this general conversation, he indicated that there were "differences" between his drawing and the one on "Roger's desk," and wondered how those would be handled. He "suggested" the answer by stating that the best thing to do would be to receive official documents from the Government to respond to. Mr. Clark responded by agreeing with the plaintiff's "suggestion." It is clear that Mr. Williams did not bring his bid drawings with him to show Mr. Clark. It is also clear that Williams did not forthrightly advise Clark that there was an error on someone's part that should be cleared up, even though he knew at that point that there existed two sets of drawings. It is simply not good enough to engage a Government official in general and unspecific conversation when an ambiguous circumstance such as here has been discovered. Upon discovery of the Government's error, the plaintiff was under a duty to inquire of the appropriate Government official in a specific and forthright manner. Although Mr. Clark was clearly an appropriate Government official under the circumstances, the inquiry was not specific nor forthright enough to shift the duty to clarify to the Government.

Moreover, the plaintiff had another opportunity prior to award to disclose the discrepancy in drawings. At the technical review conference held on June 24, 1975, Mr. Williams was asked three times in various ways by the Government to verify its bid. Each time he confirmed the bid without any reservations or further disclosures. Mr. Williams did this even after confirming that the second set of drawings the plaintiff had been given in the bid package and that Mr. Williams had sent to his regional office in San Francisco varied from his bid drawings. This is hardly reasonable business behavior.

This court, therefore, agrees with the Government that *Wickham Contracting Co. v. United States*, 212 Ct.Cl. 318, 546 F.2d 395 (1976) provides dispositive guidance in this matter. *See also, Space Corp. v. United States*, 200 Ct.Cl. 1, 470 F.2d 536 (1972); *Beacon Construction Co. v. United States*, 161 Ct.Cl. 1, 314 F.2d 501 (1963).

As this court has stated in *Wickham*: If a contractor enters into a contract aware of the fact of defective specifications, it is not entitled to recover on a claim based on these defective specifications. *R.E.D.M. Corp. v. United States*, 192 Ct.Cl. 891, 902–03, 428 F.2d 1304, 1310 (1970). At the time it was requested to verify its bid, plaintiff was aware of the drawing scale error, and whatever duty the government may have had before to advise plaintiff of the error faded. Both sides had equal knowledge of the error at this point. *Donald M. Drake Co. v. United States*, 194 Ct.Cl. 549, 555, 439 F.2d 169, 172 (1971). Plaintiff confirmed its bid after being asked to verify it. This verification request was certainly a warning that the bid might be inadequate. At this time the drawing error was known to both sides. Confirmation of its bid under these circumstances was surely "an unreasonable assumption of risk" by plaintiff. *Highway Products, Inc. v. United States*, 208 Ct.Cl. 926, 530 F.2d 911 (1976); *see also Rixon Electronics, Inc. v. United States*, 210 Ct.Cl. 309, 319, 536 F.2d 1345, 1351 (1976). If plaintiff embarked on a "ruinous course of action," it was a journey it chose to take with its eyes wide open. It certainly did not act reasonably under the circumstances and the Board

rightly denied its claim. *See Ling-Temco-Vought, Inc. v. United States*, 201 Ct.Cl. 135, 475 F.2d 630 (1973); *see also Snyder Corp. v. United States*, 68 Ct.Cl. 667, 676 (1930). Since plaintiff was aware of the drawing error at the time it entered into the contract, refusing an opportunity to withdraw its bid based on the drawing error, it is not entitled to recover additional costs by way of a contract price adjustment based on said error. *See Union Painting Co. v. United States*, 198 F.Supp. 282, 284 (D.C.Alaska 1961).

*Wickham Contracting Co. v. United States*, *supra*, 212 Ct.Cl. at 328–29, 546 F.2d at 400–01.

Since the plaintiff here acted unreasonably in the same fashion as the plaintiff in *Wickham*, as a matter of law, plaintiff's claim must be denied. Substantial evidence supports the Board's findings denying any equitable adjustment due the plaintiff on the base contract, and there are no errors as a matter of law. Plaintiff is not entitled to any equitable adjustment recovery in regard to the award of the base contract.

### C. Contract Alternates

■ The same reasoning that supports the Board's decision for denying an equitable adjustment for the base contract would, normally, apply to the award of the alternates in this case also. After all, *Wickham* is rather clear that if a contractor embarks on a ruinous course, it is a journey to completion that was taken with eyes wide open. However, several factual developments occurred in this case which in our view preterminated plaintiff's journey along its ruinous course, and in effect saves it partially from its own sins.[8]

The contract provided the unilateral right to the Government to award the alternates within 90 days of bid opening. For various reasons the Government could not accomplish the award within that time and requested that the plaintiff grant it a time extension. In its letter of August 25, 1975,

the Government requested a 45-day extension be granted to clarify the exact number of control points specified in the base bid prior to award of the alternates. Plaintiff responded by letter dated August 28, 1975, granting the extension for the purpose of clarifying the exact number of control points specified in the base bid prior to award of the alternates. The plaintiff subsequently granted an additional 10-day extension, with the cutoff date specified as October 14, 1975. On October 10, the Government unilaterally awarded Alternates A and B without having resolved (or clarified) the number of control points required under the base bid and thus required under Alternate A. On October 15, 1975, the Government sent another letter informing the plaintiff that it must provide the control points specified under the final drawings for the base contract, and at the same time requested documentation of the alleged errors made by plaintiff in its bid, so the Government could assess the situation. Further documents in the record up through at least December 1975 indicate that the Government was still "assessing" the problem. Thus, the base bid control points were still not "clarified."

It is the plaintiff's contention here that the extension was allowed by the plaintiff only on the additional contractual condition that the base bid control point numbers be clarified or fixed. The Government, therefore, could not award Alternate A until it had fulfilled that condition. Since the Government went ahead and awarded Alternate A anyway, it did so knowing what plaintiff's interpretation of the contract (Alternate A) was. Thus, as to the alternate, the Government is bound by the interpretation plaintiff placed on the contract. *Cresswell v. United States*, 146 Ct.Cl. 119, 127, 173 F.Supp. 805, 811 (1959); *see Maxwell Dynamometer Co. v. United States*, 181 Ct.Cl. 607, 628–30, 386 F.2d 855, 868–70 (1967).

---

8. None of the underlying facts involved in the award of the alternates are disputed. This court is, of course, free to interpret contract provisions as matters of law. *Maxwell Dynamometer Co. v. United States*, 181 Ct.Cl. 607, 626, 386 F.2d 855, 867 (1967).

We think the plaintiff is correct in this view. The Government did not clarify the base bid control points prior to award of Alternate A as required by the plaintiff's condition. The Government had ample opportunity to review the problem and get the matter resolved—at least administratively. It knew as early as August 8 that plaintiff was disputing the base bid control point count which impinged on the Alternate A control point count. Yet it took the Government almost 3 months to get its act together before it was even prepared to "award" the alternate and even then the Government awarded without doing anything about the condition. This case indicates a rather classic example of where the contracting officer did not exhibit the control over the contract that he or she should have had, but delegated far too much authority to other Government officials.

In any event, the court agrees with the plaintiff's legal theory in regard to the award of Alternate A. The Government is bound by the plaintiff's interpretation of what the contract called for—*i.e.*, 16 points as bid. To the extent that the Government's award of Alternate A required the plaintiff to install 54 more points (121–174) than bid, the action constitutes a constructive change and the plaintiff is entitled to recover an equitable adjustment, covering those 54 points. Furthermore, concluding to the contrary, would in our view be inequitable and amount to Government overreaching under the facts of this case. *Cf. Bromley Contracting Co. v. United States*, 219 Ct.Cl. 517, 527–28, 596 F.2d 448, 453–54 (1979).

Substantial evidence does not support the Board's position.in regard to the award of Alternate A and it is incorrect as a matter of law.