**DEREK & DANA CONTRACTING, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 507–83C.

United States Claims Court.

March 25, 1985.

David L. Mower, Richfield, Utah, attorney of record for plaintiff.

Ronald A. Schechter, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

This suit arises out of a contract entered into by defendant with plaintiff, Derek &

Dana Contracting, Inc. (D & D), a closely-held entity with its principal place of business situated in Salina, Utah, for the construction of the Ft. Duchesne Health Center (health center) in Ft. Duchesne, Utah. Plaintiff contends, *inter alia,* that the defendant was fully aware when it accepted plaintiff's bid that it did *not* contain costs for the installation of the Modular Storage System (MSS). Because of such awareness, the plaintiff argues that the defendant is bound by plaintiff's interpretation of the contract which was that the costs for the MSS would be treated as an equitable adjustment. Contrastingly, the defendant denies knowledge (actual or constructive), prior to, at, or after bid opening, that the plaintiff's bid did not contain costs for the installation of the MSS when the contract was awarded. Rather, the defendant contends that the plaintiff should be bound by its lump-sum bid which was unconditionally tendered to include *all* of the contract requirements. Thus, this fact-intensive case presents the court with the burden of resolving factual disputes where it is clear that the evidence adduced at trial was patently contradictory.

Jurisdiction over this case is premised on 28 U.S.C. § 1491 and the Contract Disputes Act of 1978, 41 U.S.C. § 601, *et seq.* Based on a thorough review of the evidence including but not limited to an evaluation of the credibility of the witnesses, the court finds that plaintiff is entitled to an equitable adjustment limited as delineated hereinafter.

### FACTS

Certain of the following background facts, found pursuant to RUSCC 52(a), are not in dispute in that they are for the most part set forth in the Joint Stipulation of Facts. Additional operative facts, as were adduced at trial, are otherwise specifically found by the court.

On August 3, 1981, Invitation for Bids (IFB) No. 181810030 was issued to prospective bidders, including D & D, for the construction of the Ft. Duchesne Health Center, Ft. Duchesne, Utah. Said IFB was issued by the Regional Office of Facilities Engineering & Construction (ROFEC), located in Denver, Colorado. Bid opening was set for 2:30 p.m. on September 23, 1981, at ROFEC's offices in Denver.

McCaleb Associates, Inc., of Edmund, Oklahoma (the Architect) prepared the plans and specifications for the construction of the Ft. Duchesne Health Center. By reason of section 11C3 of the contract specifications, the Modular Casework System (otherwise described as the Modular Storage System (MSS)), one of the components of this project, was required to be installed in the health center.

The MSS was to include, *inter alia,* counter service, pedestal storage, material supply storage, shelf storage, movable wall partitions, and hanging attachments. In short, the MSS specifications described an entirely separate modular system with removable, replaceable, and interchangeable components capable of easy assembling, dismantling, and repositioning. All components and accessories of this system were to be manufactured by one qualified manufacturer and all work was to be performed under the direction of one qualified MSS contractor (section 11C3.03(A)4 and 5).

Stipulated qualifications for MSS bidders were delineated in section 11C3.03, under the heading "Quality Assurance." Additionally, section 11C3.04(C) provided further as follows:

C. Qualified MSS Bidders: The Architect *will* issue an *Addendum* identifying the *bidders* qualified to bid *the work of this section* no later than 72 hours prior to bid opening. (Emphasis added.)

Also, the general provisions of the contract contained the standard material and workmanship clause, that read in pertinent part as follows:

Unless otherwise specifically provided in this contract, reference to any ... material ... by trade name, make or catalog number, *shall be regarded as establishing a standard of quality* and shall not be construed as limiting competition, and the Contractor may, at his option, use

any ... material ... which, in the judgment of the Contracting Officer, is equal to that named. (Emphasis added.)

In that connection, Herman Miller Company's products were referenced repeatedly in the MSS specifications by using the words "Similar to Herman Miller Co.," with the related product catalog number following (*e.g.*, Similar to Herman Miller Co./Struc. product No. 00308). Additionally, there were no provisions in the contract that "otherwise specifically provided" that Herman Miller's products should not be regarded as establishing the standard of quality to meet the MSS specifications.

Prior to bid opening (*i.e.*, September 23, 1981), or anytime thereafter, defendant, through its Architect, failed to issue the Addendum, as required, identifying "bidders qualified to bid the work of [the MSS] section." The defendant also failed to advise the prime proposed bidders that section 11C3.04(C) would not be complied with. At the trial, the Architect, Mr. Karkau, testified that he prepared the Addendum by September 14, 1981, and upon notifying defendant (ROFEC) of said fact, he was advised by ROFEC (Mr. Holtrop) that there was insufficient time to mail the Addendum to the eight prospective bidders (prime contractors). This conclusion was averred in spite of the fact that only one qualified MSS bidder (*i.e.*, Amsco Unicell) was identified by the Architect on the Addendum to be disseminated to eight prospective bidders, and the contractual requirement was that the Architect simply "issue" the Addendum no later than 72 hours prior to bid opening, which was scheduled for 2:30 p.m. on September 23, 1981. See Plaintiff's Exhibit 3.

In addition, approximately one week prior to bid opening, when contacted by the Architect's office regarding another matter, plaintiff inquired about the dissemination of the Addendum listing qualified MSS bidders and was advised that the list would be made available near the date of bid opening as provided in the specifications. Notwithstanding the foregoing, said Addendum was never issued to the prime bidders.

Against this background, the court finds that while prior to bid opening plaintiff made no *written* inquiries or requests to any distributors of Herman Miller products for the submission of a bid on the MSS, nor to the Architect or the contracting officer about the MSS, it did make telephonic contact with Herman Miller several weeks *prior* to bid opening. And, on bid opening day D & D further attempted to contact Herman Miller Company and Space Designs in an effort to solicit their bids for the installation of the MSS, on the assumption that Herman Miller was designated by the Architect as a qualified bidder on the MSS. Herman Miller, of San Francisco, California, at an earlier date, advised plaintiff that it would not provide a firm bid until the day of bid opening. Nevertheless, on the date of bid opening, Herman Miller Company advised D & D that it was unaware of the project and in turn referred it to Space Designs, a local representative in Utah.

Plaintiff's bid, which did not contain any data relative to the MSS, as required, was submitted on bid form (Standard Form 21 (Rev. 2–79)) dated September 22, 1981, and the amount(s) were as follows:

| Item | Amount |
|---|---|
| Base Bid | $1,340,000 |
| Alternate #1 (Solar Collection System) | 159,280 |
| Alternate #2 (additional landscaping) | 8,931 |
| Total aggregate bid of D&D | $1,508,211. |

On September 23, 1981, the bids were opened. However, just prior to bid opening, on said date, a D & D representative orally advised defendant that its bid did not contain MSS costs, *infra*. D & D's bid ($1,508,211) was the lowest of the eight bidders. Hogan & Tingey Construction (HT & C) submitted the second lowest bid in the aggregate amount of $1,686,000, and the government's estimate totalled $1,740,000. Thus, D & D's bid was approximately $178,000 lower than HT & C and $232,000 lower than the government's estimate.

After the bids were opened and plaintiff was ascertained to be the apparent lowest bidder, the representative of D & D, Mr. Desslie Andreason, was asked to remain and complete certain SBA documentation forms. Thereafter, on the day following bid opening, D & D met with the distributor of Herman Miller Company and exhibited copies of the MSS plans and specifications. Subsequently thereto, D & D purchased the Herman Miller MSS components from Space Designs which were shipped on May 27, 1982.

On September 25, 1981, Mr. Elwyn Holtrop, the Project Manager at ROFEC, contacted D & D by telephone seeking a confirmation of plaintiff's bid. In response thereto, by letter dated September 28, 1981, D & D confirmed its *base bid* (absent the alternative items) at $1,340,000 and instructively stated that: "We will work with the Architect, Contracting Agent or Owner in reference to suppliers." On the same day that plaintiff wrote its letter to confirm its bid, the Director of ROFEC, E.W. McIntire (*i.e.,* the contracting officer), also wrote a letter to plaintiff in which he memorialized his telephone request of September 25, 1981, *supra,* and also sought approval for waiving two irregularities that are not in issue here. However, there was nothing in plaintiff's letter *specifically* regarding the omission from plaintiff's bid of the MSS costs.

Thereafter, defendant forwarded a letter to D & D dated October 8, 1981, advising that its proposal was accepted at the base price plus the two alternative bids at the aggregate price of $1,508,211. The following day, on October 9, 1981, contract No. 181–82–2008 was awarded to D & D for $1,508,211 for the construction of the Ft. Duchesne Health Center. Following the award, a preconstruction conference was held and attended by Derek Andreason and other D & D representatives, representatives of various subcontractors, Mr. Holtrop, the Project Manager, Mr. Kenneth Karkau, the Project Architect, and other government representatives.

In a letter from D & D to Mr. Holtrop, Project Manager, dated December 2, 1981, plaintiff requested a change order (in the amount of $64,264.00) on the MSS stating that because of the confusing bidding procedure its bid did not contain a figure for the MSS in view of defendant's failure to submit the required Addendum of qualified MSS bidders to the prime bidders. Defendant, by letter dated January 26, 1982, rejected plaintiff's request (in a letter by Mr. Holtrop, Project Manager) on the grounds that (i) it failed to comply with Article I, Instruction to Bidders, which provides that any explanation of the IFB must be in writing prior to the submission of bids; and (ii) D & D confirmed its bid on September 28, 1981 without qualification or reservation.

By letter dated February 4, 1982, D & D reasserted its claim to the contracting officer pursuant to the Contract Disputes Act providing him with additional information. The claim was again rejected by the contracting officer in a letter to D & D dated July 26, 1982.

Subsequently, sometime in the late summer or early fall of 1982, ROFEC issued to D & D a stop-work order because the progress of the construction of the health center had allegedly fallen far behind schedule by delays which, in ROFEC's view, were caused by D & D's failure to properly meet the contract specifications. Although the record is deficient with respect to precise details, it does establish that some kind of an agreement was worked out (no document was offered in evidence establishing this fact, however) between ROFEC, D & D and the surety, whereby a new construction company, Granger Construction Company (Granger), was brought in to supervise D & D in the completion of the Fort Duchesne project. From and after that point in time, periodic estimates for partial payment were submitted to ROFEC, signed by Mr. M.L. Harris, "Superintendent," as the "authorized representative of D & D." Mr. Harris was, however, the owner of Granger.

## DISCUSSION

The issues presented in this case are two-fold:

(1) Whether the government knew, prior to bid opening and when it awarded plaintiff the contract, that plaintiff's bid did *not* contain a cost for the MSS?

(2) If the government knew of plaintiff's interpretation of the contract prior to bid opening and when it awarded plaintiff the contract and was thus so bound, is plaintiff entitled to recover, as an equitable adjustment, such unpaid costs (incurred and proven) for the installation of the MSS?

The answer to both questions posited is—Yes.

### A. *Notice To And Knowledge Of Defendant*

█ The plaintiff contends that the defendant well knew that D & D's bid did not include a price for the MSS because before and after the bids were opened the plaintiff's representative, Desslie Andreason, advised Mr. Jerome Weller, the government's representative and bid opening official, of the MSS cost omission. Further, notice of said fact was also given, D & D contends, by Derek Andreason, D & D's president and owner, when Mr. Holtrop, the Project Manager, called D & D on September 25, 1981, requesting D & D to confirm its bid. That notice, D & D contends, was demonstrably supplemented by its responsive confirmation letter addressed to Mr. Holtrop and dated September 28, 1981.

Conversely, the defendant denies receiving any notice from D & D, to the effect that the MSS costs were not included in their bid, until the pre-construction conference, which was held weeks after the contract was awarded. The conversations that D & D alleges occurred with Mr. Weller (on September 23, 1981) and Mr. Holtrop (on September 25, 1981) were categorically denied by said persons during their testimony. Moreover, the defendant argues that Mr. Holtrop and Mr. Weller were not authorized, at those particular points in time, to handle a bid cost omission problem.

In spite of the pertinacious denials of defendant of having received such notice, at the trial, the testimony of certain witnesses who were present at the bid opening revealed the contrary to be the fact. Mr. Carr, a general contractor employed by Hogan & Tingey Construction Company, testified that Desslie Andreason stated, prior to the time the bids were opened, "something to the extent that they had difficulty finding and/or receiving a figure on that particular item [MSS] and ... they wanted to bring that up to the bidding officer and see if ... that was a problem that any of the other contractors present had." Mr. Carr further testified that Mr. Weller asked the other contractors if they had such a problem. Some contractors *indicated yes* but because others were "not aware of what was going on in the home offices, the meeting was adjourned" to enable them to ascertain whether they also had MSS problems. Subsequently, Mr. Weller was advised by Mr. Carr, after he had called his office, that "they did not receive a firm bid on that" (MSS), and that only an estimate was put in Hogan & Tingey's bid. When the meeting reconvened, Mr. Carr testified, "there was some comment to the effect from the bid officer [Mr. Weller] that, well, we'll open the bids and work this out." Mr. Carr, however, testified that he could not remember, in particular either yes or no, whether Desslie Andreason, prior to the bid opening, made any statement to the contracting officer specifically stating that D & D had submitted its bid without including an item for the MSS.

Another representative of a competing contractor for the health center, Mr. Benny Smith, Jr., president of Beneco Enterprises, testified that Desslie Andreason stated to the government official (Mr. Weller), prior to the time the bids were opened, that "he did not have the cabinet price [MSS] included in his bid." Mr. Smith recalled (in corroboration of Mr. Carr) that right after Desslie Andreason raised the MSS problem, "they let us go out and make some phone calls to see if we had found any suppliers." Mr. Smith further testified that he called

his office and learned that it too had not received a bid for the MSS. After such information was relayed to the government official, Mr. Weller responded by stating "we'll have to take that up later." The bids were then opened. Mr. Smith also testified that even after the bids were opened, there was further conversation between Mr. Desslie Andreason and the bid official wherein Desslie stated that "there was a problem on his bid."

The testimony of Desslie Andreason, relative to the notice to the defendant's authorized agent (Mr. Weller), and corroborated by Messrs. Carr and Smith, was as follows:

Desslie testified that he represented D & D at the bid opening and that the bid submitted on behalf of D & D did not contain an amount for the MSS. Desslie also testified that before the bids were opened he brought up the fact to Mr. Weller, in the presence of all of the other bidders, that D & D had a problem with its bid. In fact, on cross-examination, Desslie persuasively testified that prior to the time the bids were actually physically opened, he specifically advised Mr. Weller at the bid opening that D & D's bid included nothing for the MSS. Mr. Weller then inquired, according to Desslie's testimony, whether the other bidders had the same problem and, when some responded that they were unsure, the meeting broke up so that the bidders could ascertain the accurate facts. Desslie similarly explained that when the bidders returned, some indicated that they had put a cost figure in to cover themselves but that they had not actually received a bid on the MSS. According to Desslie, Mr. Weller stated "let's go ahead with the bid opening and this will be handled later."

After the bids were opened, it was determined that D & D was the apparent low bidder, and in view of such, Desslie remained to fill out certain SBA certifications and other documentation required but missing from D & D's bid. Desslie testified that it was about that time that he again raised D & D's MSS problem with Mr. Weller. Mr. Weller similarly responded,

according to Desslie, that the MSS issue would be handled before the contract was awarded and further stated—"We'll take care of this later; don't worry about it."

Mr. Weller's testimony, relative to the notice of the omission of MSS costs, however, directly conflicted with the collective testimony of Mr. Carr, Mr. Smith, and Desslie Andreason. Although Mr. Weller agreed that he was the authorized bid opening official for the Fort Duchesne health center, he challenged and disavowed any efforts to characterize him as the prime contracting officer. In fact, he testified that he was not *the* contracting officer on the specific date of the bid opening, *i.e.*, September 23, 1981. But rather, he added that on the bid opening date he was the Chief of Design and Engineering and that when he took on that role he did assume the responsibilities of a contracting officer. Nonetheless, Mr. Weller testified that given the chain of command at ROFEC, established by internal regulations, he was only the contracting officer when the Director of ROFEC, Mr. Moore, and the assigned contracting officer for the Fort Duchesne project, Mr. McIntire, were out of the region. Thus, it was Mr. Weller's testimony that although he may have been a contracting officer during the month of September 1981, he was not the prime contracting officer of the project on the day of the bid opening. (But see Joint Exhibit 18 wherein Mr. E.W. McIntire states that "... the abstract of bids clearly identifies ... Mr. Jerome D. Weller, Contracting Officer....")

Further, Mr. Weller did *not* recall anything of significance occurring during the bid opening meeting that would have caused him to believe that the contractors (*i.e.*, bidders) were experiencing a problem in obtaining bids for the modular storage system. In fact, Mr. Weller did not even recall that there had been a need to stop the bid opening meeting or at least postpone it to allow the bidders to call their offices to ascertain if they had received a bid for the MSS. If an omission of MSS costs had been pointed out by a bidder

after the bid opening, Mr. Weller testified that it would have been standard procedure for the bid opening officer to "write a memorandum for [the] record on it." However, Mr. Weller stated that he did not remember the representative from D & D saying anything to him after the bid opening about the MSS or the omission of any costs from its bid. Nor was there any memorandum or record of such a statement in ROFEC's files.

On cross-examination, Mr. Weller did concede, however, that it was possible that he forgot—if Desslie had in fact mentioned the MSS cost omission from D & D's bid prior to the bid opening. Mr. Weller explicated the foregoing by testifying that:

> ... I always come into a bid opening after the appointed time and *before* [the] opening. There's always discussion going on at that time. However, when I come in, I silence all the discussion. The bids are now [the] property of the U.S. Government. They're my responsibility and they will be opened regardless of whatever problems the contractors have. *Any problems they have we'll have to deal with after* [sic]. They're in my possession ... and they will be opened. *I don't listen to any discussion. That's why I said I might have ignored it rather than forgot it.* (Emphasis added.)

In response to the court's questions, Mr. Weller later testified that he was the only person authorized to receive information and act on it *at the time of bid opening,* and to whom any problems regarding the bids or bidders should have been addressed.

While the testimony of Mr. Weller is diametrically opposed to that of Desslie Andreason, and Messrs. Carr and Smith on the notice issue, the court is compelled to find, nevertheless, that Desslie Andreason did in fact orally notify Mr. Weller, prior to and immediately following the opening of the bids, that D & D's bid did *not* include a cost price for the MSS. The court draws this factual conclusion by giving substantial weight to the corroborating testimony by giving substantial weight to the corroborating testimony of Mr. Smith and Mr. Carr, who, as competing contractors, have no personal or vested interest in the outcome of this case. That is to say, this court views Messrs. Carr and Smith to be disinterested witnesses, with regard to this litigation, and, as such, their testimony on these facts carries great weight. Additionally, the court finds that Mr. Weller was a contracting officer on September 23, 1981, at the time such knowledge was made known to the government. This fact is supported by the tacit, if not the overt, admission of Mr. Weller and confirmed and buttressed by a letter to D & D signed by Mr. McIntire (denying D & D's claim) wherein he stated "I find the abstract of bids clearly identifies that Mr. Jerome D. Weller, *Contracting Officer,* was present and opened all bids." (Emphasis added.) *See* Joint Exhibit 18. The letter went on further to say that:

> ... apparently some of the bidders had difficulties in securing firm price quotations from Herman Miller Co. However, in this instance all bidders had three reasonable alternatives.
>
> a. To submit a bid based on their own estimate.
>
> b. *To bring this issue to [the] attention of [the] Contracting Officer.*
>
> c. To decline to enter a bid.
>
> It must therefore be concluded that since this issue was not brought to the attention of the *Contracting Officer, during or prior to bid opening,* that you and all other bidders submitted a bid based on your/their estimate. (Emphasis added.)

Thus the court is constrained to conclude that the evidence requires a finding that Mr. Weller was an authorized contracting officer on September 23, 1981, and knew before, after, and at the time the bids were opened that D & D's bid did not include a cost for the MSS. Moreover, at the bid opening, Mr. Weller was *not* being asked to waive an omission in a bid. Rather, he was simply being informed, pursuant to his own acknowledged authority, that D & D did not include the MSS costs in its bid.

*Cf. Max Drill, Inc. v. United States,* 192 Ct.Cl. 608, 625, 427 F.2d 1233, 1243 (1970).

Plaintiff contends that it further notified ROFEC of D & D's interpretation of its bid offer during a conversation that Derek Andreason, D & D's president and owner, had with Mr. Holtrop, the Project Manager. At the trial Derek testified that on September 25, 1981, Mr. Holtrop called him on the telephone and that during the conversation they discussed the MSS casework. Derek testified that he told Mr. Holtrop that he had not received an Addendum on the MSS listing the qualified bidders and that Mr. Holtrop responded by indicating it would be handled as a change order. Despite Derek's vague testimony at trial, Plaintiff's Exhibit 2B, in evidence, contained an affidavit by Derek written on or about June 22, 1983, wherein he stated that when Mr. Holtrop requested D & D to confirm its bid on September 25, 1981, Derek pointed out to him that the MSS was not included in D & D's bid and that it was working to obtain quotes from qualified bidders.

Later, Derek testified that as a follow-up to his telephone conversation with Mr. Holtrop, he wrote Holtrop a letter on September 28, 1981. In said letter Derek stated that he was writing to confirm his base bid of $1,340,000.00 and that D & D "will work with the Architect, Contracting Agent or Owner *in reference to suppliers.*" (Emphasis added.) Derek explained, at the trial, that the reference to "suppliers" was his method of addressing the point he raised during the telephone conversation with Mr. Holtrop, *supra,* that D & D did not even have the list of qualified MSS suppliers to bid on the MSS casework.

In contrast to Derek's testimony, Mr. Holtrop testified that although he did call D & D on September 28, 1981, to ask D & D to confirm its bid, he did not speak with Derek. Rather, Mr. Holtrop explained that he only spoke to a woman (unnamed) with whom he left a message, asking D & D to confirm its bid by letter. Additionally, Mr. Holtrop testified that he would not have indicated that an omission in a bid would be handled as a change order because such an indication would have been beyond the scope of his authority. Moreover, he further explained that he believed D & D was able to prevail as low bidder because of the special way it handled the steel and, more importantly, because D & D really wanted the job and was willing to take less in profit and overhead. Finally, Mr. Holtrop stated that the letter Mr. McIntire wrote D & D on September 28, 1981 (Joint Exhibit 13), requesting written confirmation on the bid, would not have been sent out if ROFEC had known of D & D's MSS cost omission.

Regardless of whose testimony the court chooses to believe as to the notice dissemination on September 25, 1981, and we are convinced that plaintiff's is substantially more creditable and therefore adopt Derek's, the court finds that under either scenario the plaintiff is entitled to an equitable adjustment upon adequate proof of such expenses incurred thereby. If we believe that Mr. Holtrop only left a message with a woman at D & D requesting confirmation of its bid, then the court concludes that the government failed to carry its burden of specifically inquiring, in its confirmation request, whether the bid submitted by D & D in fact covered the MSS costs. Moreover, the direct evidence shows that several other creditable factors were present on September 25, 1981, which should have also caused the contracting officer to more thoroughly verify plaintiff's bid. First, the plaintiff's bid was 11% below the second lowest bidder and 13% below the government's estimate. Second, the government knowingly failed to issue an Addendum, listing the bidders qualified to bid on the MSS, as required by the contract, and at no time advised the bidders that the Addendum would not issue. This point is most significant in view of the fact that the Architect testified that the Addendum was ready for dissemination on September 14, 1981, nine days prior to bid opening, and Mr. Holtrop informed him that it would not be issued because there was insufficient time to notify the bidders. However, the contract only required the Addendum to be issued 72 hours prior to bid opening.

Third, the defendant did not demand any submittals regarding MSS bidders at the bid opening from D & D, as required by the contract. And finally, as we have found, *supra*, the defendant had actual knowledge (Desslie's, *et al.*, testimony) on September 23, 1981, that D & D omitted MSS costs from its bid. Thus, given the totality of the facts and circumstances presented here, while plaintiff unequivocally verified its bid in the stated amount and without condition, it is clear beyond cavil that the defendant failed to seek a proper verification when it did not specifically inquire as to whether the MSS costs were included in D & D's bid. *See United States v. Hamilton Enterprises, Inc.*, 711 F.2d 1038, 1045–46 (Fed.Cir., 1983); *BCM Corp. v. United States*, 2 Cl.Ct. 602, 608–613 (1983); and cases cited therein. Such failure, in light of the defendant's actual knowledge that D & D was misreading the specifications, *i.e.*, believing that receipt of the Addendum was a condition precedent to including bidding costs on the MSS, indicates at the very minimum a modicum of bad faith on the government's part, and ordinarily would entitle plaintiff to an equitable adjustment. *Hamilton Enterprises, Inc.*, 711 F.2d at 1046; *Ruggiero v. United States*, 190 Ct.Cl. 327, 335, 420 F.2d 709, 713 (1970); *Carrier Corp. v. United States*, 6 Cl.Ct. 169, 173 (1984).

The rationale underlying entitlement to the equitable remedy of reformation was stated in *Ruggiero v. United States*, 190 Ct.Cl. at 335, 420 F.2d at 713, as follows:

> ... what we are really concerned with is the *overreaching* of a contractor *by a contracting officer when the latter has the knowledge*, actual or imputed, as something he ought to know, *that the bid is based on or embodies a disastrous mistake, and accepts the bid in face of that knowledge.* (Emphasis added.)

To prevent the forbidden "overreaching," such as here, section 1–2.406–3(d)(1) of the Federal Procurement Regulations (FPR) (41 C.F.R. § 1–2.406–3(d)(1)) delineates the standards of a legally sufficient verification request as follows:

> Whenever the contracting officer *suspects* that a mistake may have been made in a bid, he shall immediately request the bidder to verify the bid. *Such request shall inform the bidder why the request for verification is made*—that a mistake is suspected *and the basis for such suspicion.* (Emphasis added.)

This court recently observed in *Carrier Corp. v. United States*, 6 Cl.Ct. at 173, that "[i]f the ... request for verification is inadequate under the standards set out in this regulation it is without legal effect, and plaintiff may seek reformation of the contract...."

The verification request in the instant case was totally deficient in that it was initially oral on September 25, 1981, and defendant does not contend that it complied with the regulations. Moreover, the follow-up letter of September 28, 1981, simply stated that "[w]e requested by phone on September 25, 1981 a letter from you confirming your base bid and alternate bids." Nowhere is it contended in the record that defendant complied with the obligatory language of the regulations. Given defendant's actual knowledge of the omission of MSS costs (rather than a suspicion) received on September 23rd and 25th, and its failure to specifically request a confirmation that D & D's bid did not include MSS costs, said verification request must be held to be improper and void of legal efficacy.

On the other hand, if Derek did speak with Mr. Holtrop on September 25, 1981, then it is clear that on at least two occasions (*i.e.*, September 23 and 25, 1981), prior to the award of the contract on October 9, 1981, the defendant had actual notice that D & D's bid did not include the MSS costs. Both Mr. Weller and Mr. Holtrop were government officials, who, at the very minimum, had the duty to inform the awarding contracting officer of bid problems that had been timely brought to their attention. Thus, when the plaintiff confirmed its bid through its letter to Mr. Holtrop on September 28, 1981, the defend-

ant then and there understood that the confirmation embodied D & D's price for the contract *minus* the cost for the MSS, which was to be later handled as a change order. *See United States v. Currency Totalling $48,318.08, et al.,* 609 F.2d 210, 214–15 (5th Cir.1980), *reh. denied,* 612 F.2d 579 (5 Cir., 1980); *Burke v. United States,* 107 Ct.Cl. 106, 128, 67 F.Supp. 827, 829 (1946). Consequently, the defendant knew of the plaintiff's interpretation of the contract when the contract was accepted and absent any specific evidence that the government rejected that interpretation, it was so bound. *Johnson Controls, Inc. v. United States,* 229 Ct.Cl. 445, 462, 671 F.2d 1312, 1321 (1982).[1]

While the court does not condone the plaintiff's activities in that it waited until the eleventh hour to raise the MSS problem when it knew 72 hours prior to bid opening that no Addendum had issued as well as the fact that D & D never gave ROFEC specific *written* notice of the MSS omission prior to the contract award, it nonetheless remains true that the government well knew of the plaintiff's interpretation when it accepted D & D's bid and awarded the contract. The government could have thrown D & D's bid out as nonresponsive to protect the integrity of the bidding process, but it did not elect to do so.[2] Given the foregoing circumstances, we therefore hold that the government was bound by D & D's interpretation—that the MSS would be handled as a change order. Ordinarily, plaintiff would be entitled to an equitable adjustment, in the amount claimed, save the circumstances, *infra.*

**B.** *Recoverable Costs*

■ Plaintiff seeks, in its complaint, a judgment in the sum of $85,002.14 as an equitable adjustment plus interest, attorney fees and costs. The component parts of said claimed $85,002.14 are as follows: $56,664.00 for MSS components, $1,785.00 for storage of the components, $7,861.12 (in the transcript this item is $7,861.04; however, the variance is irrelevant, *infra*) for labor for the installation of the MSS, $13,262.02 for overhead and profit, and $5,430.00 for interest. The court will address each of these claimed items seriatim.

### (i) *MSS Components*

In proof of its incurrence, the plaintiff has submitted into evidence the invoice from Space Designs (the supplier of the MSS), which contains a shipment date of May 27, 1982, and a copy of the cancelled cashier's check used to pay Space Designs $56,664.00 for the component parts. In opposition thereto, the defendant, however, asserts that it paid plaintiff the full amount for the MSS when it paid plaintiff's ninth Periodic Estimate For Partial Payment (PEFPP). See Defendant's Exhibit 3 and Plaintiff's Exhibit 7.

PEFPPs are statements that are submitted periodically by contractors to the contracting agency which summarizes the cost of work completed to date and is the certified basis for the contractor's request for partial payment for the stated period. These forms are generally submitted on a

---

**1.** In its post-trial brief the defendant cited to *Klingensmith, Inc. v. United States,* 205 Ct.Cl. 651, 505 F.2d 1257 (1974), wherein the Court of Claims upheld the General Services Board of Contract Appeals decision that a contractor's telephone call three hours prior to bid opening to the designated government official seeking a clarification and informing the official of the contractor's interpretation of the contract was not binding on the government. However, the court finds that *Klingensmith* is factually distinguishable and not controlling because in that case, unlike the situation here, the contractor had not yet submitted its bid. Here, D & D was not asking for a contract interpretation prior to its bid submission, but rather giving the govern-

ment notice of what was not in its bid after the bids had been submitted but not yet opened. Moreover, unlike *Klingensmith,* the facts here indicate bad faith (*i.e.,* "over-reaching") on the government's part in seeking verification of plaintiff's bid, *supra,* which is precisely the conduct that the regulations are designed to prevent.

**2.** It should be noted that even if plaintiff's initial bid was increased by the entire relief requested in its complaint, *i.e.,* $85,002.14, its bid still would have been lower by $93,000 and $157,000 than HT & C's and the government's, respectively.

monthly basis and the contractor's request for payment is computed on a completed contract basis. The chart below is a pro forma example of the application of the PEFPP.

| Item | First Month | Change | Second Month |
|---|---|---|---|
| Cost of work performed to date | $100 | $200 | $300 |
| Less: 10% retention | 10 | 20 | 30 |
| Net amount earned to date | $ 90 | $180 | $270 |
| Plus materials stored at close of period | 2 | 4 | 6 |
| Subtotal | $ 92 | $184 | $276 |
| Less previous payment | 0 | | 92 |
| Balance due first month | $92 | | |
| Balance due second month | | | $184. |

In short, the periodic payment to which the contractor is entitled for any given month is the difference between the accumulated net work performed plus materials stored less all prior payments.

The evidence shows, in this connection, that for the month of November 1982, Mr. M.L. Harris, Superintendent, and the authorized representative of D & D, submitted to ROFEC the PEFPP No. 9 wherein plaintiff requested a $289,682.86 payment as the balance due on said contract for the period November 1, 1982 to November 30, 1982. (See Defendant's Exhibit 1 and Plaintiff's Exhibit 7.) The amount certified to be due by D & D in PEFPP No. 9 was based on the following compilation:

| | |
|---|---|
| Net amount earned on contract work to date | $ 840,176.07 |
| Add'l materials stored at close of this period | 294,915.01 |
| Subtotal | $1,135,091.08 |
| Less: Amount of previous payments | 845,408.22 |
| Balance Due Contractor | $ 289,682.86 |

Attached to PEFPP No. 9 were several sub-schedules which provided the details for the total materials ($294,915.01) stored at the site as of the end of November 1982. A schedule entitled Long Lead Items Stored At Site—Draw # 9 contained a line

reference to invoice # 7016 from Space Designs in the amount of $56,664.00, which indicated that that amount was included in the gross materials stored of $294,915.01 and factored mathematically into the net amount requested for payment for the month of November 1982 (i.e., $289,682.86).

ROFEC, however, did not approve PEFPP No. 9 as requested by D & D and therefore made certain downward adjustments in the net amount earned to date, the materials stored, and the balance due contractor as follows:

| | |
|---|---|
| Net amount earned on contract work to date | $813,919.57 |
| Add: Material stored at close of this period | 140,135.18 |
| Subtotal | $954,054.75 |
| Less: Amount of previous payment | 845,408.22 |
| Balance due contractor | $108,646.53 |

Nonetheless, and pertinent to the issue here, the modified detailed schedules show that the invoiced amount for the MSS components ($56,664) included in the initial computation (i.e., $294,915.01) of materials stored was also included in the revised computation (i.e., $140,135.18) of materials stored as of the end of November 1982. By such inclusion, the $56,664 for the MSS was necessarily included in the $108,646.53 which D & D requested as a partial payment for the month of November 1982. Consequently, when the plaintiff received $108,646.53 for periodic payment No. 9, included in that payment was defendant's payment of $56,664.00 for Space Designs' invoice for the MSS. Plaintiff's ledger sheets indicate that on January 7, 1983, it credited its books for $108,646.53 evidencing receipt of said payment. See Plaintiff's Exhibit 7. It also is clear from the subsequent periodic payment request No. 10 (Defendant's Exhibit 3), which was signed by the authorized representative of D & D, that D & D received the $108,646.53 because the amount of previous payments was increased to $954,054.75 ($845,408.22 + $108,646.53).[3] Because the evidence ir-

---

3. The plaintiff notes that on its tenth payment request it indicated that $954,054.75 would be the total payment received when No. 9 was paid.

However, the plaintiff's ledger sheet and subsequent payment requests, Nos. 11 and 12, prove that the ninth payment was in fact received by

refutably shows that D & D has been paid for the MSS components, we hold that it is not entitled to an equitable adjustment respecting said amount. *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 199, 351 F.2d 956, 968 (1965); *Nager Electric Company, Inc., et al. v. United States,* 194 Ct.Cl. 835, 853, 442 F.2d 936, 946 (1971).

### (ii) *Storage Expense*

The plaintiff contends that it is entitled to the rental expenses ($1,785) it incurred for leasing a trailer in which to store the MSS components for approximately a year on its construction site before they could be installed into the health center. As proof of payment, the plaintiff has submitted cancelled checks to the order of the lessor, totalling $1,650.00. See Plaintiff's Exhibit 10. Although the defendant did not specifically challenge this expense in any of its briefs to the court, there was conflicting testimony by Derek Andreason and Mr. Holtrop as to who was primarily at fault for the delay in completing the project, thus necessitating the incurrence of rental expense for storage of the MSS for an arguably unanticipated period of time.

Nevertheless, there is no doubt that the contract required the contractor to store the MSS. In section 11C3.06 of the contract, it was specifically required that the contractor "[d]eliver, store, and handle all materials [MSS] so as to prevent damage and deterioration *until final acceptance of the project.*" (Emphasis added.) Storage was required to be in a "secure, locked area." There are no time limitations regarding the storage requirement other than "until final acceptance of the project." Additionally, the court does not read the underscored quoted language, *supra,* to reflect an intent of the parties to effect a penalty on plaintiff where it might be the cause for the delay in installing a stored item. Moreover, this construction is consistent with the axiom *contra proferentum.* Thus, in view of the fact that this court has determined that plaintiff is entitled to an equitable adjustment and D & D

has persuasively proven its storage costs which were incurred as a direct result of the requirement to install the MSS, the court finds that D & D is entitled to $1,650.00 for the storage expense as evidenced by the cancelled checks.

### (iii) *Labor*

The plaintiff alleges that it incurred $7,861.12 in labor expenses to install the MSS which costs were not included in its bid and which amount it has not been paid. In the record, there is conflicting testimony as to whether D & D's men or Granger's men actually installed the MSS, but it is clear that the installation occurred after ROFEC issued a stop order and caused Granger to supervise the completion of the health center. Nonetheless, in spite of the fact that Derek testified at the trial that D & D's employees installed the MSS, that D & D paid said employees, and that he had D & D's accounting work papers that detailed said labor costs which aggregated to $7,861.12, D & D submitted absolutely no documentary evidence to the court in support of its allegation of incurrence of such labor expenses. Tr. 224–225. Without any definitive documentary proof of the incurrence of these labor costs or an explanation as to why such proof or any alternative form of proof could not be produced, we find that the plaintiff has not carried its burden and therefore cannot recover the alleged labor expenses. *See Boyajian v. United States,* 191 Ct.Cl. 233, 254, 423 F.2d 1231, 1244 (1970); *Joseph Pickard's Sons Co. v. United States,* 209 Ct.Cl. 643, 652, 532 F.2d 739, 744 (1976).

Moreover, the fact that D & D is, on this record, not entitled to a $7,861.12 equitable adjustment for labor cost for the installation of the MSS is further evidenced by the fact that defendant has actually paid $3,000 to the plaintiff for such purpose. Proof of such fact is set forth in the same type of evidence, *i.e.,* PEFPP Nos. 13, 14, and 15, that establishes the payment for the MSS components. (See Defendant's Exhibits 6,

D & D. Plaintiff's Exhibit 7 and Defendant's Exhibits 4 and 5.

7 and 8.) Starting with Derek's affidavit dated June 22, 1983, contained in Plaintiff's Exhibit 2B, at page 2, it is there admitted that—"we ... included $3,000 [in D & D's bid] for uncrating and *installing the MSS.*" (Emphasis added.) This fact is further corroborated by Defendant's Exhibit 1, PEFPP No. 9, wherein said $3,000 is contained in Item #39 of Column 5 detailing plaintiff's gross bid price of $1,508,211. The fact of payment by defendant to plaintiff of the $3,000 labor cost for the installation of the MSS components is established by the collective evidence submitted by defendant consisting of PEFPP Nos. 13, 14 and 15. See Defendant's Exhibits 6, 7, and 8. That is to say that PEFPP No. 13 requested partial payment of $300 for labor cost for the installation of the MSS; PEFPP No. 14 evidenced proof of that payment and also requested the balance of the labor cost of $2,700 for installing the MSS; and PEFPP No. 15 evidenced proof that D & D in fact received payment for the $2,700. The foregoing is corroborated by the plaintiff's own ledger sheets wherein on July 11, 1983, it received a payment of $24,940.74 in response to PEFPP No. 13 in which the $300 partial payment for labor costs was included, and on July 20, 1983, it received a payment of $88,956 in response to PEFPP No. 14 in which the $2,700 balance of labor costs for the installation of the MSS was included. See Plaintiff's Exhibit 7. Thus, the foregoing evidence clearly shows that D & D included, *ab initio,* $3,000 in its bid for the installation of the MSS; that it did in fact receive payment therefore as evidenced by its own records; and that now by this petition for an equitable adjustment seeks to recover an additional $7,861.12 for installation of the same MSS for which it has already been paid. In view of the fact that the evidence shows that plaintiff has also received payment for the labor costs for installing the MSS components, and it has adduced no proof of incurrence of any additional labor costs, we find that it is not entitled to an equitable adjustment for labor costs.

## (iv) *Overhead and Profit*

D & D also contends that it is entitled to overhead and profit totalling $13,262.02. Again, not one scintilla of documentary proof was submitted to the court to substantiate this claimed amount. Further, Derek Andreason testified that he did not know if he had work papers that reflected how he arrived at the aggregate figure of overhead and profit. Tr. 225. Apparently, judging from plaintiff's post-trial proposed findings of fact, this figure was determined by taking 20% of the total of the materials, storage, and labor expenses that plaintiff alleged were attributed to the installation of the MSS ($56,664.00 + $1,785.00 + $7,861.12 = $66,310.12 × 20% = $13,-262.02).

Notwithstanding the foregoing, profit and overhead are recoverable under an equitable adjustment. *United States v. Callahan Walker Construction Co.,* 317 U.S. 56, 61, 63 S.Ct. 113, 115, 87 L.Ed. 49 (1942); *Salem Engineering and Construction Corp. v. United States,* 2 Cl.Ct. 803, 809 (1983). While there is no demonstrative evidence in the record to substantiate plaintiff's claim for profit and overhead, the contract itself does provide compensation for overhead and profit under the Changes clause. See Additional General Provision—10 Contract Changes at 1A–73–74. Under the contract, the percentages for overhead and profit allowable were not to exceed 10%, respectively, for work performed by a contractor with its forces. Thus, because the record does evidence (through invoices, PEFPPs, ledger sheets, and cancelled checks) that D & D incurred expenses for the MSS components and storage but does not indicate that D & D received any profit or overhead on those costs, *i.e.,* the government did not go forward with the evidence and prove that it has already paid D & D for overhead and profit (as it did with regard to the MSS components and labor costs), the court concludes that D & D is entitled to 10% profit and 10% overhead based on the proven expenses incurred for the MSS materials and storage which aggregates $58,314.00. Therefore, plaintiff is entitled to an equitable adjustment

of $11,662.80 for profit and overhead (20% × $58,314.00). *See S.W. Electronics & Manufacturing Corp. v. United States,* 228 Ct.Cl. 333, 351–52, 655 F.2d 1078, 1088–89 (1981); *Dale Construction Co. v. United States,* 161 Ct.Cl. 825, 830, 832–33 (1963).

(v) *Interest*

Finally, D & D seeks interest of $5,430 that it contends it is entitled to premised on a letter by the attorneys who represented Space Designs, Inc. (the MSS supplier) in its lawsuit against D & D for payment for the MSS components. (See Plaintiff's Exhibit 11.) This letter, dated May 31, 1983, states, *inter alia,* that:

> The claim to be included *on behalf of Space Designs* is interest on the invoice amount of $56,664.00 at the statutory pre-judgment rate of 10% per annum from June 12, 1982. According to our computations, this is $5,430.00. *Demand is hereby made that you include that claim with your claim against the Government.* (Emphasis added.)

On the very next day, June 1, 1983, however, Space Designs settled with D & D for $56,664.00 for all claims arising out of and connected, directly or indirectly, with the MSS. That settlement price was in an amount equaled to the precise invoice cost of the MSS component that D & D was charged at the purchase of same from Space Designs. A close reading of the quoted language from said letter, *supra,* reveals the startling fact that D & D was instructed to make "[t]he claim ... [against the government] *on behalf of Space Designs* [for] interest on the invoice[d] amount of the [MSS]." Space Designs' counsel "[d]emand[ed] ... that [D & D] include that claim (*i.e.,* interest) with [D & D's] claim against the Government." Thus, it is clear that D & D is not seeking interest from the government on any equitable adjustment to which it is legally entitled, but rather apparently seeks such

at the behest of Space Designs. There is nothing in the record that suggests privity between Space Designs and the defendant or that the former had any relationship to the latter with regard to this transaction. Nor is there any evidence of the assignment of any enforceable claim by Space Designs to D & D recoverable against the government.

Since no legal precedent has been presented to this court by D & D as to why the government should be responsible to Space Designs or D & D for D & D's failure to timely pay Space Designs for the purchase of the MSS, we see no grounds for relief. Even assuming arguendo that the government would be liable for such interest, there is on this record no proof of payment of such amount to Space Designs.

Notwithstanding the foregoing, pursuant to the Contract Disputes Act, 41 U.S.C. § 611, D & D is entitled to recover interest calculated on the amount of its recovery (*i.e.,* $11,662.80 + $1,650.00 = $13,312.80) on its claim from March 22, 1982, to the date of payment.[4]

(vi) *Attorney Fees and Costs*

As to attorney fees and costs, the plaintiff's entitlement, if any, is governed by 28 U.S.C. § 2412, RUSCC 81(e), and RUSCC 54(d). If D & D decides to seek relief pursuant to the Equal Access To Justice Act, the court will address that matter at the appropriate time. Costs otherwise permitted are denied. See *Aparacor, Inc. v. United States,* 215 Ct.Cl. 596, 607, 571 F.2d 552, 558 (1978); *Timken Company v. United States,* 590 F.2d 342, 218 Ct.Cl. 633, 636 (1978).

CONCLUSION

Consistent with the foregoing, the Clerk shall enter judgment in favor of the plaintiff in the amount of $13,312.80 plus inter-

---

**4.** This statutory provision governs despite the inclusion of the "Payment of Interest on Con-

tractor's Claims" clause in the contract. *See*

est, commencing March 22, 1982,[5] as provided in 41 U.S.C. § 611.

IT IS SO ORDERED.

*Essex Electro Engineers, Inc. v. United States,* 702 F.2d 998, 1003 (Fed.Cir.1983).

5. The parties stipulated that the contracting officer received plaintiff's certified claim on March 22, 1982. See Joint Exhibit 20.